**LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY and Their Heirs, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 93–648X.**

United States Court of Federal Claims.

April 1, 2005.

Mark Stephen Pitt, Louisville, Kentucky, for plaintiffs.

William James Shapiro, Washington, D.C., for defendant, United States Department of Justice.

## INTERIM REPORT REGARDING S. 794 "A BILL FOR THE RELIEF OF LAND GRANTORS IN HENDERSON, UNION, AND WEBSTER COUNTIES, KENTUCKY, AND THEIR HEIRS" AND MEMORANDUM OPINION

BRADEN, Judge.

Shortly after the onset of World War II, the United States ("Government") acquired approximately 35,849.28 acres of land in the counties of Henderson, Union, and Webster, Kentucky to establish an Army training facility, that later was named Camp Breckinridge. Almost all of this property was owned by farmers who resided on this land, which had been in the same families for generations and, more importantly, on which they depended for their livelihood. On March 7, 1942, the Secretary of War authorized the first of six condemnation proceedings that were filed in the United States District Court for the Western District of Kentucky during 1942–1944. Once property was judicially condemned, the landowners either could voluntarily negotiate a sale price with federal agents or require "just compensation" to be determined by a jury trial. The Government paid the landowners approximately $3,107,341 for fee simple in all of the condemned properties, whether the price was negotiated or determined by a jury.[1]

By June 19, 1951, the Department of Defense ("DOD") became aware that substantial gas and oil reserves may be located under the condemned properties and transferred oversight of these reserves to the Department of the Interior ("DOI").[2] In August 1956, DOI's Geological Survey Office confirmed the existence of substantial oil and gas reserves under the condemned properties that were being drained by producing wells adjacent to Camp Breckinridge. On March 15, 1957, two former landowners of this property, together with several local officials, sent a letter of protest to DOI when they learned that DOI planned to lease a tract of 190 acres on the east boundary of Camp Breckinridge to two private companies "to protect the United States against loss by reason of the drainage of the oil and gas deposits." The former landowners demanded that they receive the lease royalties and the right to repurchase their land, if it was declared surplus property. DOI summarily dismissed the protest. Subsequently, DOI received at least $1,833,815.73 in revenues from these leases during the period August 6, 1957–April 30, 1964.[3]

---

1. *Compare* DX 64 at DOJ1198–99 (Nov. 2, 1962 Department of Army Disposal Report No. 92 stating that Camp Breckinridge consisted of 35,849.28 acres acquired in fee simple for $3,107,341, plus $2,500 for easements on an additional 93 acres) *with* DX 77 at DOJ3463 (Nov. 26, 1962 Report of Excess Real Property stating that Camp Breckinridge consisted of 35,684.99 acres); *with* June 9, 2004 Def. Response to Plaintiffs' Requests for Admission 22 at 11 ("Admit that the United States paid the total sum of $3,098,700.76 in acquiring the Property.").

2. *See* June 9, 2004 Def. Response to Plaintiffs' Requests for Admission 27 at 12.

3. *See* DX 183 at (Ex. 80) DOJ3569; *see also* JX 54 at DOJ1552. The Government has stated that these leases were transferred to other entities, but to date has not produced documents that show the name of the transferee or how much additional revenue the Government received after April 30, 1964. *See* Gov't May 26, 2004 Answer to Interrogatory 8 at 12; *see also* William J. Shapiro Declaration, Ex. B at 2 (July 2, 2004 Certificate of Michael Dennis Daugherty, Attorney Advisor, Division of Mineral Resources, Office of the Solicitor, United States Department of the Interior stating "The Document Management Unit of the Department's Executive Secretariat assisted in ... redacting ... information concerning the sales value of oil and gas production that is privileged commercial information confidential to the producers.").

In December 1962, DOD declared Camp Breckinridge inactive and the land, together with the coal, gas, oil, and other mineral rights, were transferred to the General Services Administration ("GSA") for disposal as surplus property. On or about April 15, 1966, GSA sold the coal rights in 30,540 acres to the Tennessee Valley Authority for $7,410,000. In addition, GSA sold all of the gas, oil, and other mineral rights underneath the condemned properties to private companies for approximately $24,572,547.70.[4] Former landowners still living in the area were outraged when they learned that the Government was profiting from selling coal, gas, oil, and other mineral rights, in light of the fact that they were paid nothing or a *de minimus* amount for existing leases when their land was condemned in 1942–1944. This situation provoked one former landowner to file an ill-fated suit in the United States District Court for the Western District of Kentucky, on behalf of himself and other former landowners that was dismissed on jurisdictional grounds before a class was certified or any discovery could be taken. The appellate courts correctly upheld the trial court's jurisdictional ruling because the suit improperly was filed pursuant to the Surplus Property Act of 1944, 58 Stat. 765, a law that was repealed by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471, *et seq.*, well before the suit was filed. *See Higginson v. United States*, No.2074 (W.D.Ky. Sep. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir.1967), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968).

On or about August 24, 1967, GSA also sold coal rights on an additional 3,930 acres of the condemned properties.[5]

The manner in which GSA sold the condemned property also angered many of the former landowners, particularly those who were under the impression that the Government had promised to give them a right of first refusal, if the land was ever sold. To add insult to injury, the Government did not even attempt to provide individual notice to the former landowners of any of these events, even though members of Congress were promised that would occur. The reality is that the former landowners either did not know their farms could be repurchased or were financially prohibited from bidding, because GSA put the most desirable agricultural properties up for sale in parcels much larger than the size of the original farms. Between May 28, 1956–November 15, 1968, GSA sold the surface rights to 31,963 acres of the condemned properties for approximately $5,972,950. *See* Plaintiffs' Pre–Trial Brief at 6; DX 183 (Ex. 85) at DOJ3580–82.

Sometime in 1968, following the United States Supreme Court's denial of *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee ("the Committee") and turned to Congress to seek redress. After thirty-five years of effort, on April 19, 1993, S. 794 was introduced, "For the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs." On October 19, 1993, S. 794 and together with S. Res. 98 (Resolution, Calen-

---

**4.** *Compare* JX 48 at DOJ1537 (Jan. 18, 1965 letter to Representative Edward J. Gurney from Lawson B. Knott, Jr., GSA Administrator) ("The major portion of the mineral rights at Camp Breckinridge was offered for sale by sealed bid offering with the bid opening on April 15, 1965. The high bids received as a result of the offering total $31,982,547.70.") *with* June 9, 2004 Def. Response to Plaintiffs' Request for Admissions No. 23 at 11 ("Admit that the United States sold the oil, gas and coal rights underlying the property for an aggregate sum of $31,752,544"), *with* June 11, 2004 Def. First Supp. Response to Plaintiffs' Requests for Admission No. 23 at 2 ("Based on the October 20, 1965 Form # 1686, prepared by the Government Services Administration ... the oil and gas rights were sold for an *aggregate* sum of $24,433,247 and the *total* coal rights were sold for an aggregate of $7,410,000.

Hence, based on this document, the *total* for oil, gas, coal minerals was $31,843,247.") (emphasis added); *see also* June 9, 2004 Def. Response to Pl. Requests for Admissions No. 23 at 11 (stating that the "oil, gas and coal rights underlying the property [were sold] for an aggregate sum of $31,752,544.").

**5.** To date, the Government has declined to produce documents that provide the name of the entity that purchased these rights or the amount of revenue received from GSA's August 24, 1967 sale of an additional 3,930 acres of coal rights under the condemned properties. *See* Court Ex. 3A; Court Ex. 3I; *see also* March 25, 2005 Order denying March 24, 2005 Motion to Limit Review to the Trial Record.

dar No. 204) 103d Congress, 1st Session (Sept. 20, 1993) successfully were reported out of the United States Senate and forwarded as a Congressional Reference to the Chief Judge of the United States Court of Federal Claims.

S. 794 provided, in relevant part:

Section 1. Authorization.

The Secretary of the Treasury is authorized and directed to pay, out of money not otherwise appropriated, to the individuals (and in any case in which such individual is deceased, the heirs of such individual) who sold their land in Henderson, Union, and Webster Counties, Kentucky, to the United States Government under threat of condemnation in order to provide the 35,-684.99 acres necessary for the military training camp known as Camp Breckinridge, the sum of $_____, such sum being in full satisfaction of all claims by such individuals against the United States arising out of such sale.

Section 2. Reason for Relief.

The individuals described in Section 1 assert that they were–

(1) promised they would be given priority to repurchase land sold by them if sold by the United States Government; and

(2) paid less than reasonable value due in part to the refusal of the United States Government to compensate the owners for mineral, oil and gas rights.

S. 794, 103d Cong. (1993).

S. Res. 98 directed the Chief Judge to "proceed ... in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code, and report back to the Senate, at the earliest practicable date, giving such findings of fact and conclusions that are sufficient to inform Congress of the amount, if any, legally or equitably due from the United States to the claimants individually." As will be discussed in more detail here, a decade passed without the issuance of a

report. On August 15, 2003, this case was transferred to the undersigned judge.

The 1942–1944 condemnation proceedings displaced hundreds of landowners, their children, elderly dependants, other relatives, and tenants who lived off the land. On January 12, 1994, when this case was filed in the United States Court of Federal Claims only five of these original landowners were still alive. By the time of trial, only three were still living and not in good health. Nevertheless, despite the fact that first-hand witnesses were no longer available and the Government claimed no longer to be in possession of a substantial number of relevant documents, the evidence adduced at trial, primarily documents produced by the Government or in the public domain and testimony and documents relied on by the Government's experts, established by a preponderance of evidence a viable legal claim for which the former landowners and their heirs should be awarded compensation in an amount to be determined in the court's final disposition of this case.

## I. FACTUAL BACKGROUND

### A. Preliminary Planning For Camp Breckinridge In 1941.[6]

In 1941, the Assistant Attorney General, Lands Division of the Department of Justice, was hired as the Chief of the Real Estate Branch of the Department of Army Quartermaster Corps of the War Department ("Army Real Estate Branch") to acquire over eight million acres of land and establish over a dozen training corps throughout the United States. Initially, the Government attempted to directly negotiate purchases with property owners. Because that effort proved too time consuming, in the summer of 1941, the Government invoked the Act of July 2, 1917, 40 Stat. 241 (codified as amended at 50 U.S.C. § 171) (repealed 1956) ("War Purposes Act") initiating condemnation proceedings to evict property owners immediately so construction could begin.[7] Once property was con-

---

**6.** Unless otherwise noted, the facts recited herein primarily were derived from DX 182 at DOJ1807–1827 (Direct Testimony of the Government's expert, Dr. Leland R. Johnson).

**7.** The applicable portion of the War Purposes Act provided:

The Secretary of War may cause proceedings to be instituted in the name of the United States, in any court having jurisdiction of such

demned, the Government again attempted to negotiate a sale so further litigation would not be required. Negotiated amounts were deposited into the registry of the local federal district court so that an immediate cash partial payment could be made to the property owners until a sale could be closed.

Sometime in early August 1941, the selection of properties in the counties of Henderson, Union, and Webster, Kentucky was reported in the local newspapers as the site of a potential Triangular Infantry Division Base Camp. Captain Dewey Lyons was dispatched from duty in Ohio and ordered to assume responsibility for designing the camp, working under Lieutenant Colonel Benjamin Vandervoort, Zone Constructing Quartermaster of the Fifth Army, located at Fort Hayes in Columbus, Ohio. On August 7, 1941, Michael J. O'Bryne, the Real Estate Chief for Vandervoort, and James Miller, an attorney, Captain A.R. Ernberg, and E.E. Shore, a Federal Land Bank appraiser, met with a local real estate attorney, Ben M. Strother, to discuss how to proceed to obtain the necessary land titles. Later, Strother was appointed as an Agent of the Department of Justice to manage payments to the property owners. Contemporaneous news accounts reflected that community leaders welcomed the announcement of the training corps and economic benefits they expected would flow from the construction and new employment opportunities. Colonel Leslie Groves, Chief of the Quartermaster Construction Division, negotiated a contract for land surveys and camp design with four Kentucky architect-engineer firms that worked out of the office at the American Legion Hall in Morganfield, Kentucky to conduct surveys of approximately 55,000 acres and complete preliminary site designs by the end of November 1941.

At the same time field survey work was ongoing, Captain Lyons and Captain Ernberg undertook the project of initiating title searches working with the Franklin Title Company and local real estate attorneys. In addition, local attorneys, George Drury and J. Dorris Ruark, also worked with the survey team in the American Legion Hall and searched records at the Union County Courthouse. John Palmore was assigned to the Henderson County area and Thomas Withers of Dixon was assigned Webster County. Max Burleson from the Fifth Army Office and Courtney McElroy of Henderson coordinated this work.[8]

The Federal Land Bank in Louisville was consulted to help determine federal appraisals because much of the property at issue was collateral for federal loans. In September 1941, six Federal Land Bank appraisers set up an office in the Union County Court-

proceedings for the acquirement by condemnation of land, temporary use thereof or other interest therein, or right pertaining thereto, need for the site, location, construction, or prosecution of works for fortification ... military training camps ...; such proceedings to be prosecuted in accordance with the laws relating to suits for the condemnation of property of the States wherein the proceedings may be instituted ...
and provided further ... immediate possession thereof may be taken to the extent of the interest to be acquired and the lands may be occupied and used for military purposes[.]
50 U.S.C. § 171.

8. In 1941, appraisers, negotiators and other Government staff were provided with several publications on standards and policies that later were consolidated in 1942 into two volumes. The Guidance Manual on Standards directed appraisers to deal with property owners in an impartial and cooperative manner and conduct themselves in a manner so that appraisals could be defended in federal court proceedings. Appraisers were instructed to establish the fair market values of properties as a whole rather than by valuing individual components. So-called "split appraisals" were authorized only when a specialized knowledge of oil, gas, coal, or timber was required. The Guidance Manual also advised that the best evidence of fair market value was actual sales of similar properties in the same geographic area. Appraisers also were instructed that no value should be final without knowledge of recent sales and prices of similar properties. A Standard CR Form 24 also was provided to the appraisers. These forms were to be reviewed, approved and initialed by a Reviewing Appraiser. *See* DX 60 at DOJ721–23 (U.S. ARMY CORPS OF ENGINEERS, REAL ESTATE MANUAL (1942) at 24–26); *see also* DX 74 (June 23, 1942 Department of Justice Memorandum Re: Appraisal of Property in Condemnation Cases).

In 1944, the Department of Justice published ACQUISITION OF PROPERTY FOR WAR PURPOSES "to take inventory of the available legal machinery for acquiring property in time of war." DX 36 at DOJ0102 (DEPARTMENT OF JUSTICE, LANDS DIVISION, ACQUISITION OF PROPERTY FOR WAR PURPOSES (1944)).

house. Captain Ernberg announced that the land appraisals would not be based on the local assessed value for taxation and would not consider the value of crops, which was to be assessed by other negotiators at the time of purchase. Property owners were advised against selling timber to other agents or speculators who might try to purchase land at low prices anticipating future resale to the Government at a higher rate and because actual funding and final authorization for the project had not been secured from the War Department.

Shortly thereafter, a group of over 100 property owners convened to object to the site of the proposed training camp because of the value of the land for agricultural purposes and concerns about the experience of other property owners regarding a Fort Knox training camp, where families living on over 1,000 acres were given only ten days to relocate. Among the objecting landowners was Calvin D. Richards, an automobile dealer in Morganfield and brother of Union County Judge Thomas D. Richards. In October 1942, Captain Lyons advised a local newspaper that the field surveys and tract mapping of 57,704 acres in Union, Webster, and Henderson counties were progressing with a target date to finish preliminary planning by November 30, 1941. It also was reported that:

> Three methods are available for land acquisition. Under the War Purposes Act, the land could be acquired through a Federal Court procedure giving the War Department immediate control of the land. This procedure is employed only when an emergency exists and time is a factor. Another plan is an ordinary declaration of taking wherein the War Department takes the land and posts the appraisal price with the Federal Court until final settlement is made with property owners. The third plan is that of negotiations wherein the War Department offers each landowner a price based on appraisals.

DX 182 at DOJ1914–15 (*Planning Survey Going Rapidly on Proposed Camp,* HENDERSON GLEANER–JOURNAL, Oct. 5, 1941, at 5–6).

On December 7, 1941, the Japanese Air Force attacked Pearl Harbor. Shortly thereafter, Congress approved a $10 billion appropriation to fund construction of over two dozen training camps, including the site in Henderson, Union, and Webster Counties. Responsibility for acquiring the land for that site was assigned to Colonel C.L. Hall working in the Zone Quartermaster Office in Columbus, Ohio and the Army Real Estate Branch.

**B. Condemnation Proceedings During 1942–1944.**

On February 6, 1942, Congressman Benjamin Vincent announced that the Government had decided to condemn and take immediate possession of 10,470 acres in Union County and that federal negotiators would begin meeting with property owners to negotiate voluntary sales. The Government stated that:

> Farmers who are not satisfied with land prices will have the opportunity to appeal their case but will have to move from their homes during the litigation period. Part of the purchase money will be available to them during the period.

DX 182 at DOJ1933–34 (*Cantonment Families Get 13–Day Notices,* HENDERSON GLEANER–JOURNAL, Jan. 30, 1942, at 1, 8).

**1. February 1942 Condemnation Of 10,-427.70 Acres In Union County.**

On February 4, 1942, the Adjutant General's Office of the War Department issued a directive to the Under Secretary of War that there was a "military necessity for the acquisition of lands to provide cantonment building areas for triangular divisions and other troops" at Morganfield, Kentucky of approximately 10,427 acres, which was estimated to cost $1,011,723. *See* JX 13; *see also* JX 14; JX 22. The land was to be "acquired by such methods as [were] to the best interests of the United States in accordance with the policies outlined [by the War Department's Adjutant General's Office] February 7, 1942, AG 601.1 (1–21–42) MO–D–M, Subject: War Department Real Estate Policy." JX 14.

On February 14, 1942, the local U.S. District Attorney filed the first petition under

the War Powers Act of 1917, 40 Stat. 241, condemning 10,427.70 acres in Union County, Kentucky. On February 16, 1942, Deputy U.S. Marshal O.A. Denton served the first of 121 Orders to Vacate 99 condemned tracts of land. *See United States v. 10,427.70 Acres Situated in Union County, Kentucky*, No. 74 (W.D. Ky. filed Feb. 14, 1942); *see also* DX 182 at DOJ2075, 2079, 2085 (*Condemn 10,-427.70 Acres; Will Include 20,000 More*, UNION COUNTY ADVOCATE, Feb. 19, 1942; *Over Half of Cantonment Area Acquired, Manager Says*, UNION COUNTY ADVOCATE, Feb. 26, 1942; *Between 3 and 4 Hundred Tracts in Second Area*, UNION COUNTY ADVOCATE, Mar. 4, 1942). Thereafter, each of the landowners was visited by a member of the Corps of Engineers' negotiating team led by Willard Ewing, Land Acquisition Manager, from Cincinnati, Ohio; J.M. Canary, Chief Negotiator, from Hardinsburg, Kentucky;[9] Sterling Towles from Danville, Kentucky;[10] and Cosby Campbell from Dixon, Kentucky.

Landowners and the families were given until March 3, 1942 to vacate so that construction could begin by March 15, 1942. According to contemporaneous press accounts, this effort was not met with opposition. *See* DX 182 at DOJ2075, 2079, 2085 (*Condemn 10,427.70 Acres; Will Include 20,-000 More*, UNION COUNTY ADVOCATE, Feb. 19, 1942; *Over Half of Cantonment Area Acquired, Manager Says*, UNION COUNTY ADVOCATE, Feb. 26, 1942; *Between 3 and 4 Hundred Tracts in Second Area*, UNION COUNTY ADVOCATE, Mar. 4, 1942). Approximately 85% of the owners of the 10,427.70 acres in Union County agreed to voluntary sales and to deliver to the United States "a general warranty deed conveying said land to the United States of America in fee simple, free from all encumbrances for $1 and at the price offered by the Government land appraisal, to be paid when the United States exercised an option that would expire within 3 months." The remaining 15% were settled after federal condemnation proceedings were initiated. *See generally* JX 205–536H.

By the beginning of December 1942, the Government negotiated a "moratorium" with the oil companies that had leases with the former landowners. The oil companies were advised "they will not be entitled to exercise any of their rights under their leases for the duration of the war. After the war they will be entitled to exercise these rights." DX 627 (Dec. 4, 1942 letter of Eli H. Brown, Jr., United States Attorney, Western District of Kentucky).

On February 26, 1942, the Land Acquisition Manager advised landowners they would have first option to bid on any moveable structures at 1/10th of the appraised value. Some landowners took advantage of this offer to purchase and move buildings on their homesteads.

## 2. March 1942 Condemnation Of 19,517 Acres In Union And Henderson Counties.

On March 7, 1942, the Adjutant General's Office notified the Under Secretary of War that a military necessity existed for the acquisition of a total of approximately 29,945 acres (including the 10,427.70 acres subject to the February 4, 1942 condemnation action) in the Morganfield area. The cost of both the February 4, 1942 and March 7, 1942 condemnations was estimated at $2,927,360. *See* JX 14; JX 22 at DOJ1349. On March 31, 1942, the local U.S. District Attorney filed a second petition under the War Powers Act condemning 19,517 acres located in Union and Henderson counties. *See United States v. 19,517 Acres Situated in Union and Henderson Counties*, No. 77 (W.D. Ky., filed Mar. 31, 1942).

On April 2, 1942, the Cantonment area at Morganfield, Kentucky was named Camp Breckinridge. *See* JX 16. On that date, the second group of landowners were served with notices to vacate by May 18, 1942. This event sparked a protest meeting of the landowners that took place on August 14, 1942. One of the major concerns expressed was that land prices escalated after the Government initiated the first condemnation, making it difficult for the landowners to purchase new farms in the area at the appraisal prices

---

9. *See infra* note 11.

10. *See infra* note 11.

being offered by the Government. Over 80 landowners signed a petition stating that the Government appraisals amounted to only 50% of their value, precluding their ability to purchase suitable replacement property. On April 22, 1942, a petition was sent to President Roosevelt stating:

> We have been faced at every turn with the "take it or leave it" proposition insofar as compensation is concerned and we have been afforded no opportunity to make any speedy adjustment with the Government for a reasonable compensation for our lands....
>
> We are being told in many instances by representatives of the Federal Government, that unless we accept the unreasonable offers being made by representatives of the Government as compensation for the lands we are being deprived of, that it will be years before we will be able to obtain any compensation for the property from which we have been dispossessed. In many instances, we are unable to go to the expense of getting our claims adjusted in the Courts and we think that it is unreasonable that we should be required to do so.

DX 182 at DOJ2376–77; *see also* DX 69 at DOJ1301.

The Department of the Army was charged with investigating the petition. After an initial investigation, a public meeting was convened in Morganfield on May 14, 1942, attended by Captain Robert C. Tyler, Ohio River Division's Chief Counsel, where a majority of the landowners expressed continued dissatisfaction with the prices being offered, despite the fact that many had sold their land to the Government at a negotiated price, rather than insisting on a jury determination. Captain Tyler advised the landowners that the War Department was concerned, however-

er, if high pressure methods had been used to persuade some owners to sell.[11] By May 21, 1942, over half of the landowners in the second condemnation of 20,000 acres agreed to negotiated prices.

Based on the results of the Tyler/Harmon Report, on May 23, 1942, President Roosevelt released a letter, published in the local newspaper on May 28, 1948, that stated:

> You are advised that the War Department has investigated the situation at Morganfield and reports that the appraisers assigned to the task of making impartial, unbiased appraisals for the properties being acquired were carefully selected and are believed to be eminently qualified to determine real estate values in that particular location. The appraisals have been carefully reviewed by appraisal supervisors who state that the values placed on the properties are liberal and in line with present economic conditions in the community. The fact that approximately 70% of the landowners in the entire area have now voluntarily agreed to convey their property to the government at prices based upon the appraisals appears to confirm that view.
>
> As you are aware, no citizen is required to give an option to the Government at a price which does not meet with his or her approval. In any instance where the owner does not desire to execute an option, the War Department acquires such property through condemnation proceedings, in which event of the amount of the estimated compensation will be deposited in the Registry of the Federal Court, and may be withdrawn by the owner under a Court Order without prejudice to his right to contest for a higher valuation.

DX 183A at DOJ3355.

On June 29, 1942, the Secretary of War filed Declaration of Takings No. 1 to acquire

11. A June 10, 1942 Report of Efficiency Rating for Chief Negotiator James M. Canary for the period January 22, 1942 to March 31, 1942 was "unsatisfactory" because his conduct "showed partiality in government dealings with public, used threatening & abusive methods of doing business, respectful to those of wealth and education, exceedingly abusive of ignorant & poverty stricken." DX 261 at PER0322–23. Canary's February 4, 1943 Report of Efficiency Rating for the period April 1, 1942–May 25, 1942 also was "unsatisfactory" because "as negotiator he used duress and threatening tactics." DX 261 at PER0324–25; *see also* CX 122 (May 25, 1979 J. Sterling Towles Aff. (former negotiator stated that "government negotiators were instructed by their superiors that if the property owners questioned whether or not they would be able to repurchase the property they were to be told that they would have the first option to repurchase the property after the war.")).

5,004.97 acres in fee simple for which $312,239.00 was deposited into the Registry of the United States District Court for the Western District of Kentucky ("Registry") to compensate those landowners that sold their property to the Government at a negotiated price, as a result of the condemnation in *United States v. 19,517.30 acres. See* JX 264A–B.

### 3. June 1942 Condemnation Of 824 Acres In Union County.

On June 9, 1942, the Adjutant General's Office notified the Under Secretary of War that a military necessity existed for the acquisition of 824 acres at an estimated cost of $80,600. *See* JX 22 at DOJ1349. On June 22, 1942, the U.S. District Attorney for the Western District of Kentucky filed a third Petition, pursuant to the War Powers Act condemning 824 acres in Union County. *See United States v. 824 Acres in Union County,* No. 81 (W.D. Ky., filed June 22, 1942).[12]

On June 27, 1942, Declaration of Takings No. 2 was filed to acquire 2,171.16 acres in fee simple for which $219,807.00 was deposited into the Registry. These properties were subject to *United States v. 19,517.30 Acres. See* JX 264C & D.

On July 6, 1942, Declaration of Takings No. 3 was filed to acquire 3,813.52 acres in fee simple for which $236,149 was deposited into the Registry. *See* JX 264E. On July 27, 1942, Declaration of Takings No. 4 was filed to acquire 3,915.72 acres in fee simple for which $253,372 was deposited into the Registry. *See* JX 264F–G. On August 27, 1942, Declaration of Takings No. 5 was filed to acquire 1,691.86 acres in fee simple for which

$128,419 was deposited in the Registry. *See* JX 264H.

### 4. October 1942 Condemnation Of 5,400 Acres In Webster County.

On October 15, 1942, an additional 5,400 acres was approved for acquisition, bringing the total to 36,199 acres at an estimated cost of $3,727,460. *See* JX 19; JX 22 at DOJ1349. On October 23, 1942, the fourth Petition was filed to condemn 5,400 acres located in northwestern Webster County. *See* JX 503 at CON3830. The largest landowner, Judge Robert L. Higginson, owned 803 acres; Mr. Nealie Tapp and his sons, Bryon, Milton, and Jesse, owned 605 acres.[13]

### 5. January 1943 Condemnation Of 280 Acres.

In January 1943, the Government condemned 280 acres to expand an air field.[14] On April 13, 1943, Declaration of Takings No. 6 was filed to acquire 1,138.40 acres in fee simple. *See* JX 264I.

On May 20, 1943, Declaration of Takings No. 6–R was filed to acquire 433.71 acres in fee simple for which $27,320 was deposited into the Registry. *See* JX 264J. In October 1943, the Government condemned 1,072 acres near Sturgis, Kentucky for use as an air field.[15] *See* JX 536G.

### 6. May 1943 Condemnation Of 9.4 Acres In Union County.

On May 4, 1943, the Office of the Chief of Engineers of the War Department stated there was a military necessity for the acquisition of 9.4 acres in fee for a right-of-way

---

12. This property was owned by 15 landowners: Marion Russell; J.E. Caton; Kathryn Caton; W.B. Caton; Ella Caton; the Nancy E. Ward Estate; A.O.S. Wilson; Hessie Adamson (two tracts); Nelson Tilley; Erlene Liggett; Roy Tilley; Ruby Key; Illoff Tilley; Henry Tilley; and W.E. Liles.

13. The Government also had acquired an additional 300 acres from the Tapp family in a prior condemnation. *See United States v. 5,400 Acres Situated in Henderson, Union, and Webster Counties,* No. 88 (W.D. Ky., filed Mar. 8, 1943); JX 504 at CON3834.

14. The owners of this property were: Nina Sue Simpson; J.S. McKesig Estate; West Kentucky

Coal Company; J.C. Welch; Ralph E. Dudley; G.T. Davis; John G. Wynns; R.E. Wynns; and Otis Caldwell. *See* JX 536H.

15. The owners of this property were: John G. Wynn; Francis Meacham; Oliver Harley; George Davis; Ralph Dudley; Beulah Shoulders; Otis Caldwell; West Kentucky Coal Company; the F.M. Gilchrist Estate; the J.C. Welch Estate; C.W. Dunn; Cecilia Staton Sprauge; and J.S. McKeigh. *See* JX 536G. After World War II, the Government transferred the Air Field to Union County, which became the site of the Sturgis Kentucky Municipal Airport.

easement for construction and maintenance of a raw water line for a well. *See* JX 22 at DOJ1349. The estimated cost was $8,440. *Id.* This land, located in Union County, was described as "Agricultural land without improvements *but active mineral rights.*" *Id.* (emphasis added). This appears to be the first indication that the Government was aware of the potential value of mineral rights on the condemned properties. *Compare id.* with JX 13 at DOJ1294; JX 14 at DOJ1296; JX 21 at DOJ1336; JX 25 at DOJ1357.

### 7. May 1944 Condemnation Of 16.37 Acres In Union County.

On May 12, 1944, the local U.S. District Attorney filed a fifth Petition to condemn 16.37 acres, located in Union County, Kentucky. *See United States v. 16.37 Acres Situated in Union County Kentucky*, No. 134 (W.D. Ky., filed May 12, 1944).

### C. The Surplus Property Act Of 1944.

On October 3, 1944, the Surplus Property Act, 58 Stat. 765, was enacted. This Act authorized the Government to dispose of surplus real estate, previously acquired by the War Department, with first priority sale to the Government and second priority to States and political subdivisions. Former property owners were given a third preference to repurchase previously owned land, but only after it was declared as surplus. *See* Section 23(d) of the 1944 Act, 58 Stat. 765, 777. A former property owner also was allowed to repurchase land at the same price previously paid by the Government. That Act, however, expired three years after the end of World War II. *See* Federal Property and Administration Services Act of 1949, 40 U.S.C. § 471, *et seq.*, (1949).

16. *See* JX 46 at DOJ1531 (April 16, 1957 letter from Floyd S. Bryant, Assistant Secretary of Defense to Congressman William N. Natcher, Second District of Kentucky, advising that approximately 1/3 of Camp Breckinridge or 12,000 acres was outleased for agricultural purposes.); *see also* PX 272 (Newman Dep.) at 15–17 (Newman testified that he had a five-year lease on some of his property after World War II, but his lease was terminated after the Camp was revived. In

### D. 1957 Disposition Of Waller Young Property.

On December 9, 1954, DOD declared that approximately 212.5 acres of Camp Breckinridge was excess real property. *See* JX 6 at DOJ0298 (indicating that this land was subject to an agricultural lease to Mr. Waller Young, the former owner for the term March 1, 1951–February 28, 1956.) *Id.*[16] Thus, the 212.5 acres was conveyed to the Government on March 18, 1944, following a jury determination that the fair market value of the land was $26,711.86 or $125.70 per acre, including $2,643.40 for oil and gas rights. *Id.* at DOJ0300–01; *see also* JX 10 at DOJ0957. On May 28, 1956, upon receiving $48,875.00 or $230 per acre,[17] GSA executed a quit claim deed to Waller Young, pursuant to the Federal Property and Administrative Services Act of 1949 (40 U.S.C. § 471, *et seq.*), and regulations and orders promulgated thereunder. *See* JX 6 at DOJ0305–06.

Although documents in the record state that this property was advertised to the general public in advance of sale and sold at public auction, in fact, none of these documents evidence that the Government advertised the availability of this specific land for purchase. *See* JX 10 at DOJ0996 (March 4, 1968 Tract Register re: Quit Claim Deed, dated 5–28–56 re: 3.30 acres sold to Waller Young for "Maintenance of Water Line," March 10, 1954 Directive, pursuant to DA ACS 5th Ind.); *see also* JX 60 at DOJ1586 ("In 1954, a 212.5–acre parcel of installation land was determined to be excess[.] After clearance with the Armed Services Committees of the Congress, (10 U.S.C. [§ ] 2662), the land was reported to the General Services Administration[.]"); DX 64 at DOJ1198 (indicating that the 212.5 acres were sold "following agreement with the respective Committees on Armed Services in Army Disposal Project No. 28[.]").

1953–54, Newman again leased property, but he let the lease expire after the Camp was designated as a summer training facility for Reserve Troops in 1955); *see also* DX 64 at DOJ1219.

17. *See* JX 10 at DOJ0957 (indicating that Waller Young sold 1,026.8 acres to the Government on April 18, 1944 for $147,663.16 or $143.80 per acre).

In light of the fact that Waller Young's property was located almost in the middle of Camp Breckinridge, *see* PX 77a, it is difficult to understand why DOD was compelled to identify this sole parcel as "excess real property," to the exclusion of all other Camp Breckinridge real property at that time. Mr. Waller Young, however, was the former Mayor of Morganfield.

### E. The Department Of The Interior's 1956 Discovery Of Oil And Issuance Of Oil And Gas Leases in 1957 And 1959.

On May 4, 1943, the Office of the Chief of Engineers of the War Department reported a military necessity to acquire 9.4 acres in fee for a right-of-way easement for construction and maintenance of a raw water line for a well. The estimated cost was $8,440. This land was described as "Agricultural land without improvements, *but active mineral rights,*" located in Union County. *See* JX 22 at DOJ1349 (emphasis added).

On February 14, 1946, the Chief Engineer for the Department of the Army advised Congressman Earle C. Clements, Second District of Kentucky, that:

> The Government is the owner and in possession of considerable land at each of these installations (Ohio River Ordnance Works and Camp Breckinridge, Kentucky). There has been considerable prospecting for oil in the two counties where these Government properties are located and there has been much speculation as to whether or not the Government would consider an oil lease to private interests on either or both of these installations. Under existing law [Surplus Property Act of 1944, as amended], should this land be disposed of to private interests, the former owner would be given preference and it is my judgment since there is a prospect of this occurring there should be no separation of the surface and mineral rights.

JX 46 at DOJ1531–32.

On January 2, 1948, the U.S. District Attorney instituted condemnation proceedings regarding existing oil and gas leases on real properties. *See United States v. Leasehold Interest In Oil and Gas Rights in 2,314.14 Acres Situated in Union, Webster, and Henderson Counties,* No. 371 (W.D. Ky., filed Jan. 2, 1948). *See* JX 535.

On June 19, 1951, jurisdiction over all gas and oil deposits on the Camp Breckinridge site was transferred from DOD to DOI, pursuant to an April 24, 1943 Executive Order No. 9337, to protect the Government's interests from loss due to "drainage or threatened drainage [of oil and gas.]" *See* JX 4 (16 FED. REG. 6132–35 (June 26, 1951)).

Sometime in May 1954, DOI's Office of Geological Survey confirmed that potentially significant oil and gas deposits were present under the Camp Breckinridge lands. *See* DX 40 at DOJ0311. In August 1956, that Office confirmed that oil and gas deposits under Camp Breckinridge were being lost due to "drainage," caused by wells adjacent to the Camp boundaries. *See* DX 40 at DOJ0311. On or about March 15, 1957, DOI announced the intention to issue protective leases to prevent those oil and gas deposits from being drained. *See* DX 158 at DOJ1527.

On March 15, 1957, Dr. W.H. Puryear of Morganfield, Kentucky and Judge A.G. Pritchett of Henderson, Kentucky wrote a letter to the Director of the Bureau of Land Management to protest the proposed protective leases of oil "underlying the lands owned by us until same were condemned by the United States" and demand the right to "receive our proportionate part of the royalty oil that is produced and sold from the lands formerly owned by us until taken from us by the Government for military purposes.... Will you kindly acknowledge the filing of this protest so that we may protect our rights in property that we believe when it ceases to be used for military purposes or is classified as excess or surplus land, that we should be given preference in repurchasing it from your Department or some other branch of the Government." DX 158 at DOJ1527–28.

Less than a month later, on April 22, 1957, without a formal hearing, the DOI's Director of the Bureau of Land Management issued a "Decision" dismissing the "Protest" objecting to the Government issuing oil and gas leases on a 190 acre tract within Camp Breckinridge. *See* DX 40; *see also* DX 182A at

DOJ2699 (Mar. 22, 1957 letter from the President of Felmont Oil to Bureau of Land Management requesting that the 30–day appeal period be eliminated). The Decision summarized the former landowners "Protest" in this way:

use [of their former land] for commercial purposes, such as oil and gas leasing, is contrary to the use and purpose for which the lands were originally acquired; that if no longer needed for military purposes, the lands should be declared excess or surplus and that pending such action by the Department of the Army, the protestants are entitled to their proportionate share of the royalties from the production out of this land.

DX 40 at DOJ0310.

DOI conceded in the Decision that:

*Lands acquired by the Government for use for military purposes,* such as the Camp Breckinridge area, *are not subject to lease for development of the mineral deposits therein under the general authority contained in the Acquired Lands Mineral Leasing Act of August 7, 1947* (61 Stat. 913, 30 U.S.C. [§ ] 351) which is administered by this Department.

*Id.* at DOJ0310 (emphasis added).

Nevertheless, DOI stated that:

the Attorney General has ruled that, in those cases where lands are being drained through operations on adjoining privately-owned lands, there is implied authority for the United States to take such action as may be necessary to adequately protect itself from loss by reason of the drainage (40 Op. Atty. Gen. 41).

Although this protective action may be taken by the branch of the Defense Department which acquired the land, jurisdiction over the oil and gas deposits for that purpose may be transferred to another department or agency if it is deemed advisable to do so. Jurisdiction over the oil and gas deposits underlying the Camp Breckinridge area, comprising a total of 35,-839.88 acres, was transferred to this Department by Public Land Order No. 729 dated June 19, 1951, under the express condition that the Department of the Army

shall exercise primary jurisdiction over these lands for military purposes.

No steps have heretofore been taken to offer any of the lands for oil and gas leasing because of the intensified military use of the camp area which commenced in September 1950. Investigation of the drainage situation by the Geological Survey of this Department in May 1954 disclosed that the threat of drainage from oil wells in the South Morganfield oil field had been diminished to a considerable extent, if not entirely eliminated. Consequently, further action on this matter was then suspended pending completion of a study by the Army of its need for the land for military purposes.

The situation with respect to drainage of the oil and gas deposits at Camp Breckinridge remained unchanged until August 1956, when the Geological Survey reported that a total of 14 wells had been completed during 1956 in the Dixie, West Field or Abell area of Henderson County, Kentucky, adjacent to the east boundary of the camp. These wells were producing from the First and Second Pennsylvania sands at an approximate depth of 975 feet, except for one well producing from the Cypress sand of the Mississippian age at a depth of 2,260 feet. Initial daily production capacities of the wells ranged from about 25 to 120 barrels of oil, with production at that time from 8 wells being 168 barrels per day. The camp is offset directly by 5 of these wells. In order to protect the United States against loss by reason of the drainage of the oil and gas deposits occurring from the Camp Breckinridge lands, the tract of 190 acres on the east boundary of the camp was offered for leasing on March 20, 1957.

The jurisdiction over the oil and gas deposits now being vested in the Department of the Interior, this Department has the legal obligation to take such measures as may be necessary to protect the interests of the United States from loss through the extensive drainage of these deposits presently occurring from the Camp Breckinridge lands.

Inasmuch as exclusive jurisdiction over these lands is vested in the Department of the Army, the future disposition of such lands rests with that agency and in the event the lands should be declared surplus, the disposition of the minerals therein will be governed by the law in effect at that time.

In view of the foregoing circumstances, and in the absence of legislation, this Department would be remiss in its duty of protecting the Government property and the public interests from loss by reason of the drainage of the oil and gas deposits in the Camp Breckinridge lands if the issuance of an oil and gas lease for this 190–acre tract were withheld. Accordingly, the protests against the leasing of this land are hereby dismissed.

*Id.* at DOJ0310–12. The record in this case does not evidence that the former landowners filed any appeal or collateral attack of DOI's decision in federal court.

On May 1, 1957, the Government entered into an oil and gas lease, KYBLM–A–044315, with Felmont Oil Corporation of Owensboro, Kentucky ("Felmont Oil") for oil and gas underlying 190 acres of Camp Breckinridge. *See* DX 183A (Ex. 73) at DOJ3440; *see also* Gov't's May 26, 2004 Answer to Interrogatory 8 at 12. This lease indicates that it is subject to prior leases with [Judge] Ashley G. Pritchett and Willard Greenwell who were occupying the land for "agricultural and grazing purposes." DX 183A (Ex. 73) at DOJ3442.

The following map shows the 190 acres leased by Felmont Oil.

DX 183A (Ex. 73) at DOJ3441.

The Felmont Oil lease produced 611,235 barrels of crude from August 6, 1957–April 30, 1964, during which period the Government received $272,883 in royalty payments and a "bonus" of $432,236. *See* DX 183A (Ex. 80) at DOJ3569; *see also* DX 182A at DOJ2699.

On December 1, 1959, the Government entered into a second oil and gas lease, KYBLM–A–050213, with Kingwood Oil Company ("Kingwood Oil") for oil and gas underlying 700 acres of Camp Breckinridge. *See* DX 183 (Ex. 74) at DOJ3451; *see also* Government's May 26, 2004 Answer to Interrogatory 8. This lease was subject to prior leases with Mark Greenwell for "agricultural and grazing purposes[.]" DX 183 (Ex. 74) at DOJ3452. Drilling was prohibited until Greenwell's lease expired on October 31, 1959. *Id.*

The following map shows the 700 acres leased by Kingwood Oil.

DX 183 (Ex. 74) at DOJ3461.

From January 19, 1960–April 30, 1964, the Kingwood Oil lease produced 934,498 barrels of crude oil during which time the Government received 15% of the gross production or $418,443 in royalties and a "bonus" of $708,253. *See* DX 183 (Ex. 80) at DOJ3569. The total revenues that the Government derived from both the Felmont Oil and Kingwood Oil leases was at least $1,833,815.73.

*Id.; see also* JX 54 at DOJ1552. DOI reported that Kingwood Oil conveyed all interests in lease KYBLM–A–0520213 to another company on October 1, 1977 and Felmont Oil conveyed interests to another company on May 1, 1961. *See* Government's May 26, 2004 Answer to Interrogatory 8 at 12. To date, the Government has not produced documents that evidence the names of the entities that acquired these leases or the amount of revenues the Government received on either of these leases after April 30, 1964.

### F. Disposal Of Camp Breckinridge.

On March 14, 1946, certain housing facilities at Camp Breckinridge were declared surplus. *See* JX 27. On January 16, 1948, the United States Housing and Home Finance Agency transferred certain facilities to the Department of Army. *See* JX 30. On July 15, 1948, however, Camp Breckinridge was returned to active status because of the Korean War. *See* JX 31; *see also* JX 32; JX 37. By the fall of 1949, some of the land at Camp Breckinridge was offered to the former landowners, but only on a five-year lease. *See, e.g.,* DX 643; CX 272 (July 13, 1995 Newman Dep.) at 15–17; Tilley Dep. at 39–40. After the Korean War concluded in 1954, Army Reserve and National Guard units continued to train on the site until 1959.

On October 31, 1962 and November 2, 1962, Army Disposal Report No. 2 was submitted to the United States Senate and United States House of Representatives Armed Services Committees, respectively, pursuant to 10 U.S.C. § 2662. *See* JX 58 at DOJ1580; DX 64 at DOJ1179, 1198–99 (Disposal Report); *see also* JX 7; JX 60 at DOJ1586; DX 77 at DOJ3463. In December 1962, after both Committees approved the Disposal Report, DOD issued a Report of Excess Real Property that was forwarded to GSA for implementation, in a manner consistent with the "best interests" of the Government. *See* Surplus Property Act, Section 502, 50 U.S.C. §§ 1611–1646 (1944).

#### 1. The April 15, 1966 Sale Of Coal, Gas, Oil, And Other Mineral Rights Under The Condemned Properties.

On January 5, 1965, GSA issued Invitations for (Sealed) Bids on all mineral rights on approximately 36,000 acres comprising Camp Breckinridge. *See* JX 47 at DOJ1535–36; JX 58 at DOJ1581; *see also* DX 183 at DOJ2789 (July 21, 2004 Brigham Direct at 34) (reporting that the January 7, 1965 edition of the UNION COUNTY ADVOCATE stated that more than 500 sealed bids had been submitted to GSA for mineral rights).

The GSA advertisement read as follows:

**POTENTIAL UNDERGROUND WEALTH!**

**U.S. GOVERNMENT SALE**

**FULL SUB–SURFACE INTEREST**

**MINERAL RIGHTS**

**COAL, OIL, GAS AND ALL OTHER MINERALS**

**CAMP BRECKENRIDGE**

**1½ MILES EAST OF MORGANFIELD, KENTUCKY**

**GSA DISPOSAL NO. [ILLEGIBLE]**

**TO BE SOLD BY SEALED BID**

**BID OPENING THURSDAY, APRIL 15, 1965 (3:00 P.M.-C.S.T.)**

This government property for sale is an unusually fine opportunity for the investor. Look at the facts.

**APPROXIMATELY 35,000 ACRES**–Divided into 10 tracts.

**EXISTING PRODUCING LEASES INCLUDED**

**IN MINERAL RICH COUNTRY**—This northwestern Kentucky property off U.S. Highway 60 is located in Henderson, Union and Webster Counties. Here is a strategic exploratory area surrounded by the following pools: Little Dixie, Sebree, Niagara, Baskett, Henderson, Poole. The property is also in the heart of the western Kentucky coal fields.

**AND–A TOP WORK AREA**—The area offers numerous advantages: ample skilled and unskilled labor; bus, truck and rail;

approximately seven miles from Ohio River port; full educational system plus four colleges nearby.

**BIDDING**—The mineral rights are being offered in tracts and not by acreage. The following items will be offered in each tract: Item A-coal rights only; Item B-oil, gas and all other minerals, except coal; Item C-all mineral rights. Bids may be submitted on individual items and tracts or any combination of items and tracts. Bids must be submitted on bid forms provided by General Services Administration.

CX 244.

On January 14, 1965, an industry publication, "Scout Check, Inc.," alerted subscribers that, because "so many requests for maps and information on the Government sale of Camp Breckinridge" had been received, the publication was featuring "a map of the camp divided into Tracts as they will be sold and showing the surrounding production and the Rough Creek Fault system, making this piece of oil property one of the most attractive in the country to oil and coal prospectors." Court Ex. 4 at 1. This report advised that Camp Breckinridge was divided into ten tracts, excluding Tract # 1 and the Barracks area from sale. *Id.* at 1. Mineral rights were to be sold, but the surface rights were reserved for sale at a later date. *Id.*

Regarding the upcoming mineral rights sale, it was reported that:

the [C]amp has tremendous possibilities for oil being found under it. All of the fields around the [C]amp have been discovered since the camp was built. In 1956, the Dixie West Pool was discovered in the southwest quarter of 0–22, in Pennsylvani-

an and Cypress sands, and has accumulated over 4½ million barrels of oil to date with the field still producing over 80,000 barrels per month. Felmont Oil (now owned by Cities Service Oil) leased 190 acres of the camp from the Government and has produced over 718,000 barrels from 18 wells, still producing 12,800 barrels per month. (See Tract 7–B)

In late 1959, Kingwood Oil leased an additional 700 acres from the Government (see Tract 7–A) and has produced over 1,021,000 barrels to date, still making 10,600 barrels per month from 14 wells. Kingwood paid a bonus of $708,000.00 for their acreage and Felmont paid $432,000.00 to the Government. . . .

Other fields around the [C]amp that will probably be extended are the Morganfield South Pool, discovered in 1948, accumulating 7,250,000 barrels to date, producing 40,500 barrels per month. This field lies on the west side of the reservation, just north of the Rough Creek Fault, and will probably be extended well intro Tract 2, along the fault zone. Four miles straight east of this field, back in 1930, there were several holes drilled in the northwest corner of 1–N–20 that had shows of oil in the Pennsylvanian, with one or two of them producing for a short time. There will probably be oil found somewhere between these dry holes and the Morganfield South production.

*Id.*

The following map shows the 10 tracts of coal, gas, oil, and other mineral rights to be awarded at the April 15, 1965 auction.

Court Ex. 3I at 12; Court Ex. 4 at 2.

All of the bids were to be sealed, forwarded with a cash deposit, and received by April 15, 1965 at 3:00 p.m. at the GSA's Business Center in Chicago. CX 244. The successful oil and gas bids, by tract were: Tract 1—Sun Oil Co. (Evansville, Indiana) and Texas Gas Exploration Co. (Houston) jointly bidding $29,481; Tract 2—Texaco, Inc. (Tulsa) $7,613,000; Tract 3—East Oil Co. (Wilmington, Delaware) $7,360,324.76; Tract 4—East Oil Co. $48,076.26; Tract 5—Allied Chemical Corp. (Houston) $1,011,274.00; Tract 6—Sun Oil Co. and Texas Gas Exploration Co. jointly $2,251,979; Tract 7—East Oil Co. $1,064,112.78; Tract 7A—Cities Service Oil Co. (Oklahoma) $56,249.95; Tract 7B—Cities

Service Oil Co. $80,949.95; Tract 8—Texaco Co. $7,124,000. *See* DX 183 (Ex. 82) at DOJ3575 (Apr. 26, 1965 UNION COUNTY ADVOCATE at 1). The oil and gas bids on Tracts 7A and 7B covered only "partial rights" because they were subject to Kingwood Oil's lease on Tract 7A and Felmont Oil's lease on Tract 7B. *See* DX 183 (Ex. 82) at DOJ3575 (Apr. 26, 1965 UNION COUNTY ADVOCATE at 1).

The Tennessee Valley Authority ("TVA") was awarded coal rights on 30,590 acres as "the highest bidder [approximately $7,410,000] in a 1965 sale conducted by the General Services Administration." *See* WALL STREET JOURNAL (Feb. 11, 1969) at 24; *see*

*also* DX 183 at DOJ2789; DX 183 (Ex. 83) at DOJ3576–77; DX 183 (Ex. 84) at DOJ3579. It appears that TVA's bid was quite a bargain since only four years later— on or about February 11, 1969— TVA awarded Peabody Coal Co. a lease to mine these coal reserves at Camp Breckinridge for $400 million. *See* WALL STREET JOURNAL (Feb. 11, 1969) at 24.

On June 11, 1965, Public Land Order No. 729 of June 19, 1951 was revoked by Public Land Order 3706, pursuant to Executive Order No. 10355 (17 FED. REG. 4831), 1952 WL 5780 and jurisdiction over oil and gas rights on Camp Breckinridge land was transferred from DOI to GSA. *See* DX 183 (Ex. 72) at DOJ3437.[18]

On June 18, 1965, GSA Administrator Lawson B. Knott, Jr., advised Congressman Edward Gurney that as a result of the April 15, 1965 offer to sell coal, gas, oil, or other mineral rights, the GSA received "high bids" of $31,982,547.70. *See* JX 48 at DOJ1537.

### 2. April 15, 1965 *Higginson* Law Suit.

On April 15, 1965, Mr. Cyrus Higginson, on behalf of himself and "all other former landowners, or heirs, successors, and assigns thereof, of 36,000 acres, namely Camp Breckinridge, in Union, Henderson and Webster Counties, Kentucky" filed a complaint in the United States District Court for the Western District of Kentucky, Owensboro Division. The complaint requested that the action be designated as a class action, pursuant to Fed.R.Civ.P. Rule 23(3)(b). *See* DX 64 at DOJ1069. An April 29, 1965 Amended Complaint set forth claims under the Fifth and Fourteenth Amendments of the United States Constitution and violations of the Surplus Property Act of 1944, both as to land and mineral rights. *See* DX 64 at DOJ1080–85.

At the conclusion of a July 30, 1965 trial, the Honorable Henry L. Brooks, Chief Judge of the United States District Court for the Western District of Kentucky, delivered an oral decision and entered an Order sustaining the Government's motion to dismiss:

**18.** It is not clear whether GSA had authority on April 15, 1965 to award any bids on the oil and gas, however, the court assumes the relevant

The plaintiffs had failed to state a cause of action, and that the Government's Motion to Dismiss would be sustained, and that the United States Attorney was to tender findings of fact and Conclusions of Law in support of this Court's oral opinion.

DX 64 at DOJ1209. Subsequently, the trial court entered a written order on August 2, 1965 sustaining the Government's Motion to Dismiss. *Id; see also id.* at DOJ1247 (Sept. 9, 1965 Final Order).

On September 28, 1967, the United States Court of Appeals for the Sixth Circuit in a *per curiam* opinion, held as to Count I of the Third Amended Complaint that since the Surplus Property Act was repealed in 1949 "13 years before Camp Breckenridge was declared surplus and 16 years prior to commencement of this action[,] [o]bviously no right could accrue to plaintiff thereunder." *Higginson v. United States,* 384 F.2d 504, 506 (6th Cir.1967).

As to Count II seeking a judgment under 28 U.S.C. § 1346(a)(2) (1964) in the sum of $9,300 as "reasonable rental" for Higginson's property after the Government ceased using it for military purposes, the appellate court held that:

> The government's title to the land acquired by negotiated purchases vested some 20–30 years ago. This title cannot now be disputed under any accepted property theory.

*Id.* The appellate court further held in light of the language of the Declaration of Taking:

> Title to land obtained by condemnation vests upon the filing of the declaration of taking. 40 U.S.C. § 258(a), *supra.* This title, however, is subject to a right of the former land owner to challenge the taking as not being for the prescribed statutory purpose. *Catlin v. United States,* 324 U.S. 229, 240–243[, 65 S.Ct. 631, 89 L.Ed. 911] (1944)[(1945)]. This problem is not in issue in the instant case because Camp Breckenridge was erected in accordance with the prescribed military purpose. Consequently, valid title passed to the

sales documents, which are not in the record, were executed after June 11, 1965.

United States when the declaration of taking was filed.

\* \* \* \* \* \*

The validity of title is determined by the conditions existing at the time of the taking. Also, title to property which is vested in the United States government cannot be returned to the original land owners without Congressional authorization ... the declaration of taking clearly provided for fee simple title. Second, many years passed after Camp Breckenridge was abandoned as a military base without a claim against the government's title. Such claims were initiated only after oil was found on the property.

\* \* \* \* \* \*

Our conclusion that the government acquired the fee makes it unnecessary, of course, to consider plaintiff's claim for 'reasonable rental' for occupancy subsequent to the use for military purposes.

*Id.* at 507–08.

### 3. The 1967 Sale Of Coal Rights.

On August 24, 1967, GSA announced that coal rights on 4,800 acres consisting of 3,930 acres (Tract 1), 700 acres (Tract 7A) and 190 acres (Tract 7B) would be subject to a sealed bid auction to be held in Chicago on September 29, 1967. *See* Court Ex. 3A (Aug. 24, 1967 GSA News Release); Court Ex. 3I.

It appears, however, that GSA sent "invitations to bid" only to selected entities. Of further interest is a caveat on the "Notice to Prospective Bidders," which stated:

*Under no circumstances* should this invitation be given to any other person or firm for use in submitting a bid. The General Services Administration, Region 5, maintains and furnishes copies of this Invitation to any parties interested in submitting a bid. Interested parties should contact the Business Service Center for Invitation copies and information desired.

The Business Service Center maintains a record of the names and addresses of all parties issued copies of this Invitation to Bid[.]

Court Ex. 3I at 2.

The sealed bids were not opened in the local community, but at GSA's Chicago office. *Id.*

#### a.) Tract No. 1.

The surface area of Tract No. 1 was represented as a portion of lands conveyed to the Commonwealth of Kentucky for park, recreational, and wildlife conservation purposes and the remainder to Allen D. Freer. *Id.* (Invitation for Bids at 5); *see also supra* at ——(map).

The description of Tract No. 1 indicates that the oil, gas, and other mineral rights (except coal), located in Webster and Union Counties, previously were conveyed to the Sun Oil Company and Texas Gas Exploration Corporation by recorded deed. *Id.*

#### b.) Tract No. 7A.

The surface area of Tract No. 7A was located in Union and Henderson counties and is "contained within portions of surface parcels" conveyed in: Parcel No. 8A in Union County to Richard L. Maloney and Patrick A Maloney. Court Ex. 3I (Invitation for Bids at 5). Parcel No. 9 in Henderson County was conveyed to the Gibson Livestock Company. *Id.* Parcel No. 9A in Henderson County was conveyed to Aaron G. Pritchett and Mary Edith Pritchett. *Id.* Parcel No. 10 located in Union, Henderson, and Webster counties was conveyed to James C. Bickett, Margaret Agnes Bickett, Edmond Bickett, and Lula Margaret Bickett. *Id.* at 6.

Oil, gas, and other mineral rights (except coal) located in Henderson County were reported as subject to Federal Lease BLM–A–050213 with the Kingwood Oil Company. *Id.; see also supra* at ——(map).

#### c.) Tract No. 7B.

The surface area of Tract No. 7B, a portion of surface Parcel No. 9A, located in Henderson County, was conveyed to Aaron G. Pritchett and Mary Edith Pritchett by warranty deed. *See* Court Ex. 3I (Invitation for Bids at 6).

Oil, gas, and other mineral rights (except coal) located in Henderson County, pursuant to Federal Lease BLM–A–044315, were reported as subject to a prior lease with the Felmont Corporation of Owensboro, Kentucky. *Id.; see also supra* at 679 (map).

The following map shows the location of Tract 1, Tract 7A, and Tract 7B.

Court Ex. 31 (Ex. B).

### 4. The 1965–1972 Sale Of Real Estate.

By February 5, 1965, the GSA was making final plans for the disposal of the excess real property at Camp Breckinridge, pursuant to the Federal Property and Administrative Services Act of 1949.

On June 11, 1965, Public Land Order No. 729 of June 19, 1957 was revoked because the Department of Army reported to the GSA that the remaining was excess property. *See* JX 8. At that time, two tracts of land in the amount of 890 acres were subject to leases administered by the GSA. *See id.*

On February 5, 1965, Congressman William H. Natcher of the Second District in Kentucky also was advised that by Howard Greenberg, GSA Commissioner, that "[y]ou may be assured that careful consideration

will be given to offering [the Camp Breckinridge] property for sale in parcels following generally the former ownership pattern." JX 47 at DOJ1536; *see also* JX 54 at DOJ1543.

On February 5, 1965, GSA Commissioner Greenberg advised Congressman Natcher that "a procedure is determined to be consistent with the best interests of the United States, [the GSA] afford[s] former owners an opportunity to reacquire their former holdings at their current fair market value by disposing of surplus property in which there is former owner interest by public sale in parcels following generally the former ownership pattern." JX 47 at DOJ1535.

On June 18, 1965, Congressman Edward J. Gurney was advised that GSA's "[c]urrent planning contemplates that the major portion of the surface rights will be offered for sale by public auction. We have advised the office of the GSA Regional Administrator . . . concerning the interest of Mr. L.R. Cambron, 2514 MacFarland Drive, Cocoa, Florida, in reacquiring the property he formerly owned. If the property he formerly owned is offered for sale, you may be assured that Mr. Cambron will be notified and furnished complete information concerning the offering." JX 48 at DOJ1537.[19]

The Government, however, did not afford former owners "a special notice to bid" nor were their farms offered for sale in parcel size following the former ownership plan.

From September 30, 1965 through January 14, 1972, GSA conducted seven auctions, during which period it disposed of 35,816.58 of the initial 35,849.28 acres acquired in 1942–1943. *See* DX 85 at DOJ3581–82. The September 30, 1965 auction of 3,923 acres and the March 1, 1966 auction of 22,300 acres

concerned property that was considered the most desirable for agricultural purposes.

### a. September 30, 1965 Auction Of 3,923 Acres.[20]

On September 30, 1965, GSA held a first auction of 10 parcels of land totaling 3,923 acres located within Union and Webster counties. Court Ex. 3J at 2 (Advertisement for Government Sale at 1). The land was sold excluding minerals and was described as: "fertile land ideal for agricultural or grazing use." *Id.* (Advertisement for Government Sale at 1) At the time of the sale, the land was leased for agricultural and grazing purposes and was *"divided into various sized parcels in order to meet the needs of a variety of interest purchases." Id.* (emphasis added).

### b. March 1, 1966 Auction Of 22,300 Acres.[21]

On March 1, 1966, GSA held an auction of 22,300 acres located in Henderson, Union, and Webster counties divided into 35 parcels. *See* Court Ex. 3D. The Notice of Auction Sale concerned "surplus real property, except minerals and mineral rights of every kind and character, located in the State of Kentucky as described herein." *Id.* (Notice of Auction Sale at 1). In sum, the Government advertised this sale of 22,300 acres as "ideal for agricultural use and pasture land. The property . . . is divided into various sized parcels in order to meet the needs of a variety of interested purchasers." *Id.* (Advertisement for Government Sale at 1).

The real property to be auctioned consisted of 22,300 acres, located in Henderson, Union, and Webster counties, and was divided into 35 parcels, *i.e.,* Parcel No. 2A (467 acres), 2C (435 acres), 2D (354 acres), 4 (973

---

**19.** (A Final Tract Register, dated February 10, 1949 indicates that John B. Cambron, Jr. owned Tract A–4, consisting of 80 acres, that was sold to the Government for $6,280.76 on March 18, 1944, pursuant to a jury determination. In addition, John B. Cambron, Jr. received an "excess award" of $400 for oil and gas rights, $119.24 of which was refunded to the Government for oil and gas rental). *See* JX 10 at DOJ0947; *see also* JX10 at DOJ0949 (A Final Tract Register, dated February 10, 1949 indicates that John B. Cambron, Jr. also owned Tract A–17, consisting of

224 acres, that was sold to the Government for $20,307.24 on March 1, 1944, pursuant to a jury determination. In addition, he received an "excess award" of $1,120 for oil and gas rights, $186.76 of which was refunded to the Government for oil and gas rental).

**20.** *See generally* Court Ex. 3J.

**21.** *See generally* Court Ex. 3D.

acres), 8A (430 acres), 9 (700 acres), 9A (435 acres), 10 (697 acres), 10A (707 acres),. 11 (738 acres), 12A (800 acres), 13 (775 acres), 13A (567 acres), 14 (914 acres), 14A (560 acres), 15 (1,016 acres), 17 (237 acres), 18 (1,090 acres), 20 (388 acres), 24 (476 acres), 25D (97 acres), 25E (82 acres), 26A (572 acres), 30 (644 acres), 31 (431 acres), 32 (442 acres), 34 (601 acres), 35 (526 acres), 36 (1,177 acres), 37 (625 acres), 38 (803 acres), 39 (812 acres), 40 (608 acres), 42 (1,460 acres), and 43 (698 acres), including certain parcels of unimproved land and others that included minor improvements and/or miscellaneous buildings. *Id.* (Advertisement for Government Sale at 2).

Unlike the April 15, 1965 auction, the March 1, 1966 event took place at Camp Breckinridge. *Id.*

### c. February 25, 1967 Auction Of 600 Acres.[22]

On February 25, 1967, GSA auctioned 600 acres in Union County, divided into 48 parcels. Army buildings, walks, and roads were located on most of this property, which made it unsuitable for agricultural use. Accordingly, none of this land was subject to prior lease. *See* Court Ex. 23A (Feb. 23, 1968 GSA Real Estate Disposal Activities Control Form D–KY–432B); Court Ex. 3B (Advertisement for Government Sale at 2). The mineral rights to this property were not included and were "excepted or reserved." *Id.*

### d. May 5, 1967 Auction Of 1,100 Acres.[23]

On May 5, 1967, GSA auctioned 1,110 acres, consisting of two parcels. *See* Court Ex. 3K (Advertisement for Government Sale at 1). Parcel 22 consisted of 570 acres, excluding 5 acres of land and buildings and mineral rights. *Id.* at 2. Parcel 23 consisted

of approximately 590 acres, excluding 5 acres of land and buildings and mineral rights. *Id.* This land also was not subject to prior lease. *Id.*

### e. June 6, 1967 Award Of 4,528 Acres To Commonwealth Of Kentucky, Department Of Fish And Wildlife Resources.[24]

On June 6, 1967, GSA announced that it awarded on that day, 4,528.49 acres to the Commonwealth of Kentucky's Department of Fish and Wildlife Resources together with 10 miscellaneous structures to be used as a public park and recreational purposes, pursuant to Public Law 80–616. Court Ex. 3A (June 6, 1967 GSA News Release). An additional 900 acres was to be utilized as a wildlife conservation area, pursuant to Public Law 80–537. *Id.*

### f. February 26, 1969 Auction Of 5.915 Acres.[25]

On January 23, 1969, GSA announced the auction of two parcels of land. *See* Court Ex. 3A (Jan. 23, 1969 GSA News Release). Parcel 33A was 3.145 acres with a five bedroom house. *Id.* Parcel 13–1A was 2.77 acres of land with a seven bedroom house. *Id.*

### g. November 14, 1968 Auction Of 159.5 Acres.[26]

On October 9, 1968, GSA announced the sale of two contiguous parcels of land, of approximately 100 acres and 59.5 acres on which various military structures were located.

### h. January 14, 1972 Auction Of 4,220 Acres.[27]

GSA announced disposal by auction of 4,220 acres with a six room farm house on January 14, 1972.

---

**22.** *See generally* Court Ex. 3A (Feb. 23, 1968 GSA Real Estate Disposal Activities Control Form D–KY–432B); Court Ex. 3B.

**23.** *See generally* Court Ex. 3K (Advertisement for Government Sale).

**24.** *See generally* Court. Ex. 3A (June 6, 1967 GSA News Release; Oct. 25, 1978 letter from Paul E. Goulding, Deputy Administrator, GSA, to Congressman Romano L. Mazzoli).

**25.** *See generally* Court Ex. 3A (Jan. 23, 1969 GSA News Release); Court Ex. 3E.

**26.** *See generally* Court Ex. 3A (Oct. 9, 1968 GSA News Release); Court Ex. 3F.

**27.** *See generally* Court Ex. 3G.

### G. Formation Of The Breckinridge Land Committee In 1968 And Enactment Of S. 794 In 1993.

Sometime in 1968, after the United States Supreme Court denied *certiorari* in the *Higginson* case, a group of former landowners and/or their heirs formed the Breckinridge Land Committee and turned to Congress to seek redress.[28] *Compare* Higginson Dep. at 285, 304, 328; CX 267 (Murphy Dep.) at 13–14, 18, *with* CX 53.

The first specific request for a Senate inquiry of this matter appears to have been directed to the GSA by Senator Walter D. Huddleston on or about June 6, 1973. *See* CX 22 (Ex. B22 to Claimants' Dec. 14, 2004 Motion Regarding Trial Exhibits); *see also* JX 57 at DOJ 1565 (Apr. 17, 1974 letter from Senator Marlow W. Cook to Mrs. Ruby [Higginson] Au.).

Sometime in 1978, the Breckinridge Land Committee garnered the support of a non-profit environmental public interest organization, known as the Kentucky River Coalition ("KRC"). A graduate of Eastern Kentucky University in journalism, with an interest in environmental issues, was assigned to interview former landowners and government representatives and search for records that might support the former landowners' grievances. *See* CX 267 (Murphy Dep. at 9, 13, 15, 16, 17, 21, 22, 24). KRC assisted in locating many of the former landowners who signed Affidavits to preserve their knowledge of the 1942–1944 condemnations.

The work product of KRC is reflected in an April 6, 1979 Report forwarded to Senator Wendell Ford, Senator Walter Huddleston, Congressman William H. Natcher, and Congressman Carroll Hubbard. *See* CX 11.

In 1983, at the request of Senator Wendell A. Ford of Kentucky, Senator Charles E. Grassley, then Chairman of the Administrative Practice and Procedure Subcommittee of the United States Senate, forwarded S. 1104, "For the relief of the grantors of certain land in Henderson, Union, and Webster Counties, Kentucky" to the Senate Judiciary Committee. The Department of the Army, however, opposed enactment of S. 1104 and no further congressional action took place at that time. *See* JX 60 at DOJ 1584–88.

On January 6, 1987, Senator Ford again introduced a bill, substantially similar to S. 1104, that also failed to be reported out of the United States Senate. *See* 133 CONG. REC. S12183–01. Subsequent efforts failed in 1989 and 1991. *See* 135 CONG. REC. S9366–01 (Aug. 1, 1989); 137 CONG. REC. S12183–01 (Aug. 2, 1991); *see also* CX 36 (Ex. B) (Oct. 23, 1981 letter from Senator Wendell H. Ford to Senator Charles E. Grassley, Chairman, Senate Subcommittee on Agency Administration); CX 37 (Ex. B) (Jan. 31, 1980 letter from Senator Walter D. Huddleston to Senator Edward M. Kennedy, Chairman, Senate Judiciary Committee).

On April 19, 1993, Senator Ford introduced S. 794, "a bill for the relief of land grantors in Henderson, Union, and Webster Counties, Kentucky, and their heirs." *See* S. 794, 103d Cong. (1993). On October 19, 1993, S. 794, together with S. Res. 98, 103d Cong. (1993), were reported out of the United States Senate.

## II. PROCEDURAL HISTORY

### A. 1994.

On January 12, 1994, a Complaint was filed in the United States Court of Federal Claims and assigned to a judge to act as a Hearing Officer.[29] The Complaint had counts: Count I alleged that the "Condemnation of Real Property Interests" violated the Just Compensation Clause under the Fifth Amendment to the United States Constitution; Count II alleged that the "Condemnation of

---

28. *See, e.g.,* JX 58–59 (referencing letters from Mrs. Ruby Higginson Au in 1976, 1978, and 1979 to Congressman Carroll Hubbard); Court Ex. 3A (referencing Congressman Gene Snyder forwarding letter of Mrs. Ruby Higginson Au to Paul E. Goulding, Deputy Administrator, GSA).

29. Pursuant to the Rules of the United States Court of Federal Claims, after a complaint is filed by any interested party, the Chief Judge then designates one of the judges of the United States Court of Federal Claims to serve as a Hearing Officer. *See* RCFC App. D ¶ 5. The Chief Judge also assigns three other members of the United States Court of Federal Claims to serve as a Review Panel. *Id.*

Real Property Interests" violated Claimants' rights both "to just compensation and due process of law upon the condemnation and seizure of their real property interests;" Count III alleged that the "Condemnation of Sub–Surface Mineral Interests," further defined as "sub-surface mineral, gas, oil, and/or coal deposits" under the condemned properties, violated the Just Compensation Clause of the Fifth Amendment to the United States Constitution; Count IV alleged that the "Condemnation of Sub–Surface Mineral Interests" violated the Due Process Clause of the Fifth Amendment to the United States Constitution; Count V alleged that the "Vested Right of Re–Purchase" set forth in Section 23(d)(1)(A) of the Surplus Property Act of 1944 was ignored in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution; Count VI alleged that the loss of agricultural products violated the Just Compensation Clause of the Fifth Amendment to the United States Constitution; Count VII alleged that the loss of agricultural products violated the Due Process Clause of the Fifth Amendment to the United States Constitution; and Count VIII alleged a "general equity claim."

On April 29, 1994, the Government filed an Answer. On May 14, 1994, Plaintiffs filed a First Set of Interrogatories and Request for Production of Documents. On July 1, 1994, the parties filed a Joint Status Report and Related Motion to Stay. On July 11, 1994, the judge initially assigned to this case entered an Order suspending proceedings and directing the submission of proposals by July 29, 1994 as to whether the parties could agree to a stipulation of facts. On July 29, 1994, that judge was advised that the parties would not agree to a stipulation of facts. On August 11, 1994, that judge issued an Order suspending pre-trial proceedings to allow the parties to agree on a procedure to notify all potential Plaintiffs of the Complaint. On December 12, 1994, a scheduling conference was convened. On December 16, 1994, a Memorandum of Conference and Order was issued deferring the deadline for Plaintiffs filing an amended complaint and requesting a report by January 17, 1995 to advise the court about the status of notification efforts.

**B. 1995.**

On January 24, 1995, the parties filed a Joint Motion for leave to establish a cut-off date of August 23, 1995 for the notification of all potential Plaintiffs. The court granted the Joint Motion on that same date and established a deadline of September 22, 1995 for Plaintiffs' counsel to file an Amended Complaint.

During July 13–14, 1995 and on August 8, 1995, Plaintiffs took depositions of six former landowners.

On September 22, 1995, a First Amended Complaint was filed listing 1,011 Plaintiffs by name and reasserting Counts I–VIII, essentially as pled on January 12, 1994. On September 22, 1995, Plaintiffs filed a Motion to Certify This Matter as a Class Action. On November 3, 1995, the Government filed an Answer and Opposition to the Motion to Certify a Class. On December 11, 1995, Plaintiffs filed a Reply.

**C. 1996.**

No action was taken by the parties or the court in this matter in 1996, because the court considered it "potentially helpful to obtain the current position of the United States Supreme Court [in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)] on FRCP 23 proceedings." Dec. 23, 1997 Order at 1.

**D. 1997.**

No action was taken by the parties or the court in this matter until December 23, 1997, when an Order was entered denying Plaintiffs' Motion to Certify This Matter as a Class Action, together with an Order establishing the exchange of pre-trial memoranda and related submissions.

**E. 1998.**

On January 9, 1998, the Government filed an Unopposed Motion to Stay Pre–Trial Proceedings to allow the filing of a motion to dismiss regarding asserted claims not within the scope of the Congressional Reference. On January 12, 1998, the court granted the stay, but set February 6, 1998 as the date by

which the Government's "dispositive motion" should be filed. On February 13, 1998, the Government filed a Motion to Dismiss Claims and Parties Outside the Scope of the Congressional Reference, with leave. On April 21, 1998, Plaintiffs filed a Response. On May 12, 1998, the Government filed a Reply. On May 14, 1998, Plaintiffs filed a Supplemental Response, including an April 23, 1998 letter from Senator Wendell H. Ford reciting the history and purpose of S. Res. 794.

On June 4, 1998, Plaintiffs filed a Reply. On June 29, 1998, the Government filed a Sur–Reply. On November 24, 1998, the court issued an Order dismissing Paragraphs 43–46, 50–64, 74, 87–93, 98–114, 118–122, 132–144, 164–165, and 171 of the First Amended Complaint. In addition, all individuals listed on the September 22, 1995 First Amended Complaint, whose land was acquired by the Government through Declarations of Takings or Final Judgments entered in Condemnation Proceedings, were dismissed. On November 24, 1998, the court rejected Plaintiffs' Supplemental Response, which was withdrawn from the record, by Order of that date.

## F. 1999.

On March 1, 1999, Plaintiffs filed a Motion to Stay Pre–Trial Proceedings, pending submission of a June 1, 1999 Status Report regarding whether "discussions leading to a non-trial resolution" was ongoing. That Motion was granted on March 8, 1999. On June 1, 1999, Plaintiffs advised the court that the parties "believe that pretrial proceedings should remain stayed so that the parties can continue to pursue settlement." On June 3, 1999, the court entered an Order continuing stay of the pre-trial proceedings, but requiring Plaintiffs to submit a Status Report on August 3, 1999 and "each 60–day period thereafter" if "discussions leading to a non-trial resolution of this matter are ongoing[.]" Otherwise, Plaintiffs were given until August 3, 1999 to submit pre-trial submissions.

On August 19, 1999, October 6, 1999, and December 6, 1999, Plaintiffs filed Status Reports advising the court that a review of the historical records to determine the impact of the November 24, 1998 Order dismissing cer-

tain claims and settlement discussions were ongoing. The Government filed no statement in opposition to any of the representations in Plaintiffs' 1999 Status Reports. No action was taken by the court in 1999 after entry of the June 3, 1999 stay.

## G. 2000.

On February 4, 2000, Plaintiffs filed a Status Report advising the court that counsel still was reviewing the administrative record to compare "the information contain[ed] in that record with other historical information in order to verify who among the [Plaintiffs] has been impacted by the rulings of the Hearing Officer dismissing certain of the claims in this matter. We are now in the process of determining the effects of a possible settlement on the claims of those owners/heirs who have avenues of appeal from the Hearing Officer's ruling."

On April 6, 2000, the court was advised that "Counsel for the United States recently has reviewed and agreed with the information provided by the [Plaintiffs] identifying who among the original [Plaintiffs] sold their property, as opposed to having that property condemned. We are now in the process of identifying— for each parcel of property sold to the Government— all of the original owners and the sales price of the property. We should be in a position to engage in further settlement negotiations shortly."

On June 6, 2000, the court again was advised that "Counsel for the United States recently has reviewed and agreed with the information provided by the [Plaintiffs] identifying who among the [Plaintiffs] sold their property, as opposed to having that property condemned. We are in the process of determining the parameters for settlement and procedures for ensuring proper evidence of entitlement to participate in any settlement."

On August 7, 2000, Plaintiffs filed a Status Report identical to that filed on June 6, 2000.

On October 5, 2000, Plaintiffs reported that "[t]he parties have been working through how to deal with situations where there may have been multiple owners of a parcel of property taken by the United States, but not all of the owners are represented by the

current [Plaintiffs]. We anticipate that the United States will respond to [Plaintiffs'] proposal for dealing with such situations shortly."

On December 1, 2000, Plaintiffs advised the court that "[t]he parties recently have communicated again regarding how to deal with situations where there may have been multiple owners of a parcel of property taken by the United States, but not all of the owners are represented by the current [Plaintiffs]. We are still attempting to work through that issue and its impact on the parameters of a possible settlement."

The Government filed no statement in opposition to any of the representations made in Plaintiffs' 2000 Status Reports. No action was taken by the court in 2000.

### H. 2001.

On February 1, 2001, April 3, 2001, May 30, 2001, July 31, 2001, and September 25, 2001, Plaintiffs filed Status Reports advising the court that settlement discussions were ongoing, although it appears that counsel for the Government was unavailable to work on this matter during the period February 1, 2001–September 25, 2001.

On November 26, 2001, Plaintiffs advised the court that counsel "are engaged in a renewed and positive dialogue regarding a possible settlement[.]"

The Government filed no statement in opposition to any of the representations made in Plaintiffs' 2001 Status Reports. No action was taken by the court in 2001.

### I. 2002.

Plaintiffs' January 23, 2002 Status Report was nearly identical to that filed on November 26, 2002. On March 21, 2002, Plaintiffs advised the court that they currently were evaluating the "possible parameters for settlement of the claims ... in hopes of having a meeting between counsel in Louisville or Washington in the near future."

The court received the same report on May 21, 2002, July 16, 2002, September 13, 2002, November 13, 2002, and January 8, 2003.

The Government filed no statement in opposition to any of the representations made in Plaintiffs' 2002 Status Reports. No action was taken by the court in 2002.

### J. 2003.

On March 10, 2003, May 6, 2003, and July 2, 2003, Status Reports were filed advising the court that Plaintiffs were working "to collect information from the numerous individual [Plaintiffs] in this matter to respond to the United States' request for detailed individual data" and that settlement discussions were ongoing.

The Government filed no statements in opposition to any of the representations made in Plaintiffs' 2003 Status Reports. No action was taken by the court from January 1, 2003–August 15, 2003.

\* \* \* \* \* \*

On July 14, 2003, the undersigned judge took the Oath of Office and on August 15, 2003 was assigned this case as a Congressional Reference. On September 9, 2003, Plaintiffs filed a Status Report advising the court that, as a result of the November 24, 1998 Order:

the owners/heirs of the vast majority of the 35,000–plus total acres currently have no standing as [Plaintiffs]. Of the total 35,-648.99 acres mentioned in the Reference, only some 7,252 acres are currently in the case[.] Of those acres, named [Plaintiffs] representing only some 5,589 acres currently are parties to this action. That amounts to slightly under 16%.

Since the Hearing Officer's narrowing of the claimants, counsel for the parties have engaged in settlement discussions. Part of those discussions involves a threshold determination as to whether there was any disparity in the per acre sales prices received by those property owners who sold "under threat of condemnation" as compared with the per acre prices received by the landowners who participated in the land condemnation litigation process and, if so, the amount.

The Government also requested that claimants undertake to determine whether there are individuals who are not parties to this

action but who should have been entitled to compensation had they joined pursuant to previous scheduling orders. That exercise would serve to further limit the Government exposure under the Congressional Reference. That request required claimants also to determine those persons who would actually be in line as "heirs" of original landowners, serving to remove potentially superfluous "heirs" who would not "take" due to occupying a more remote level in the lineage of the original landowners than other named claimants.

The former task turned out to be substantially less difficult and time-consuming than the latter tasks. The identification both of individuals who did not join in this action and those remote and superfluous heirs among the named claimants, *e.g.*, great-grandchildren of landowners where grandchildren are still alive and are named claimants, has taken well over a year. The process has involved a group of over fifteen attorney-supervised paralegals expending several hundred hours in attempting to identify and communicate with as many of the individual named plaintiffs as possible in order to ascertain their true status. That exercise is no "99%" complete. Within the next few days, counsel for the claimants anticipate being in position to provide counsel for The United States with refined information which, hopefully, can form the basis for a fair and final resolution of the claims of the remaining true claimants.

30. It was not until January 2004, that the Government retained a "real estate expert." DX 651 at 2 (Nov. 15, 2004 Direct Testimony of John D. Dorchester, Jr., MAI, CRE at 2). On April 12, 2004, the Government issued a First Set of Interrogatories and Request for Production of Documents, answered between May 5, 2004–July 7, 2004 by a group of elderly heirs of former landowners including: William H. Luckett; Helen J. Gonz; Thomas G. Cambron; Endema Haleman Nite; Thomas P. Luckett; Mary Dixon; Ruth Russell Burgess; Peggy Russell Ranney; Frank Davis; Thomas Randall Timmons; Bobby G. Duncan; Carl Culver; Derral W. Culver; Alma Sue Culver; Gary K. Culver, Sr.; Anna Catherine Culver Weigand; Bonita L. Culver; John Culver; Carole Ann Vaughn Spears; Elsie Vaughan Russere; Helen Emma Vaughan Rowley; Doris Jean Spears Drury; Myrtle Carolyn Barker; Bonnie

On September 24, 2003, the court convened a telephone scheduling conference, at which time the Government's counsel appeared to be optimistic about settlement, likely because the Government was not prepared for trial.[30] Therefore, the parties also were advised that if no settlement was reached by the end of 2003, the court would set the case for trial.

In addition, on September 25, 2003, the court entered an Order requiring Plaintiffs:

> to send all relevant material concerning value differential and a formula basis for settlement to [the Government] on or before October 10, 2003. [In addition, the Government's counsel was] ORDERED to review the material and make a recommendation to his superiors concerning the value differential issue and the possibility of settlement on or before October 31, 2003. Thereafter, [the Government's counsel was] ORDERED to notify the court of his superiors approval, or lack thereof, of his recommendation on or before November 28, 2003.

On October 23, 2003, a new lead Department of Justice staff attorney was assigned to this case and the previous counsel was transferred to the Civil Division of the Department of Justice. On November 25, 2003, a Joint Status Report was filed wherein both parties advised the court that, "While the parties expect a short delay to enable new counsel to familiarize themselves with [the] facts of this case and to evaluate settlement, both parties expect that this matter will be resolved through settlement."

S. Bridewell; Steven M. Spears; Mildred Frances Spears Dye; Donald Spears; Mary Ann Spears Nevitt.

On May 13, 2004, the Government retained a historian "to research the history of Camp Breckinridge ... focusing on land acquisition and construction of the camp in the historical context of 1941–43 and addressing the government's fairness in its property appraisals and treatment of the landowners." DX 182 at DOJ1807 (July 21, 2004 Direct Testimony of Leland R. Johnson, Ph.D.). Sometime in May 2004, the Government decided to hire an expert to "research and analyze historical aerial photography from the 1940s and develop an expert opinion about what the individual tracts were like when they were acquired." DX 652 at 3 (Nov. 16, 2004 Direct Testimony of Ms. Mary D. Sitton, President of ERI at 3).

On December 9, 2003, the court entered an Order setting a Status Conference for February 20, 2004, at which time the Government's counsel and direct supervisor were ordered to appear.

## K. 2004.

On January 12, 2004, Plaintiffs filed a Status Report advising the court that Government's counsel "would not recommend settlement at the amounts set forth in [Plaintiffs'] presentation, but raised some issues and suggested that the parties continue discussions between now and the January 31, 2004 deadline[.] Even though more than four years have passed since the parties first began serious settlement discussions, [Plaintiffs] remain hopeful that this matter will be resolved through settlement." On January 30, 2004, the Government filed a Status Report reviewing the settlement proposed by Plaintiffs. On February 20, 2004, Plaintiffs filed a Position Statement on Delay Compensation. On February 25, 2004, the Government filed a Memorandum Addressing Plaintiffs' Claim of Entitlement to Interest on Any Award of Just Compensation.

On February 20, 2004, a Status Conference was held in Washington, D.C., where the court began the proceeding by observing:

THE COURT: I was surprised to read the [Government's] last status report because it was my impression, based on the first telephone conference we had together, that [the parties] were very close to settlement in the case. This is a congressional reference case. It has been pending in the Court for over a decade. I just received the case . . ., if I don't feel that the government is going to be in a position to resolve this . . . we were going to set a trial date. I regret that in some sense because it seems to me that you at least at one point seemed to be fairly close to a resolution of things. A fair amount of work has been done by the [Plaintiffs] in the case. I kind of got the sense that they may have been sandbagged a bit into getting all this work done to find out who the grantors were, and then were kind of left with a situation that there's nothing they can do really to resolve this short of going to trial. That exercise, while interesting, wasn't productive.

TR at 3–4.

\* \* \* \* \* \*

THE COURT: I appreciate having [the Government's staff counsel's] direct superior here today because I want to be sure that the Department [of Justice] is focused on helping us either move it ahead or to get a trial, but this is really going to be a priority, at least for me. The bulk of the delay obviously was not during either of these gentlemen's watch.

PLAINTIFFS' COUNSEL: No, and I certainly make no allusions to that—

THE COURT: No, and I want to be sure that they understand that's my view, as well. We're going to get our hands around it at this point and get it resolved one way or the other.

TR at 10.

\* \* \* \* \* \*

Next, the court heard from the Government's counsel:

THE COURT: I appreciate this is a new assignment for you.

GOVERNMENT'S COUNSEL: Well, thank you, Your Honor.

THE COURT: I'm sure it's a challenge.

GOVERNMENT'S COUNSEL: Well, I look forward to getting involved in more depth, Your Honor. My name is Bill Shapiro, and I represent the United States in this matter. At counsel table with me is Marc Smith. He is the Assistant Chief in the General Litigation Section. He's in charge of the roughly 10 attorneys who handle the inverse takings claims against the United States.

THE COURT: I appreciate him taking the time to be here today at my request because I want to be sure that you're involved and you understand the Court's perspective of getting this matter moved[.]

GOVERNMENT'S COUNSEL: And Your Honor, I feel like I do need to say something about what the Court referred to as a delay, and perhaps sandbagging. That, of course, would not be the government's perspective. This case has been around

for quite some time, but as I'm sure the Court is aware, there were several dispositive issues that took place at the early stages of this case that did delay the matter-

THE COURT: The telephone conference I had with your predecessor, I clearly got the impression from him that this case was much closer to resolution than the status report that I've received from you. There may be any number of different reasons for that, but I was really surprised when I saw that. I was expecting basically to see a letter saying we've settled the case.

GOVERNMENT'S COUNSEL: Well, my understanding from talking to Mr. Schoenburg, as Mr. Pitt just indicated, there was a period of time back before January 2002 where Mr. Schoenburg and Mr. Pitt were discussing how to reasonably approach this difficult issue because this is a unique situation. We're dealing with events that occurred decades ago. *The government, when we first learned of this congressional reference, went back and looked through our records to see what we still had on file.* (emphasis added).

\* \* \* \* \* \*

GOVERNMENT'S COUNSEL: The ... *value of the mineral rights on these properties. This, we believe, may be the most important part because it directly relates to the terms of the congressional reference.* The congressional reference pertains only to those individuals who were "paid less than reasonable value, due in part to the refusal of the United States government to compensate the owners for mineral, oil and gas rights." Several of these properties at the time, 1941, had leases to third party oil and gas companies. *By our analysis, there was something like 65 percent of the condemned properties had such a lease, and about 30 percent of the properties that were voluntarily sold had these leases in place in 1941.* (emphasis added).

THE COURT: How do we know the value of those leases at this point?

GOVERNMENT'S COUNSEL: Well, that's the thing. In both the condemned properties and the voluntarily purchased properties, there's a separate category of

damages that was sent, not to the landowners, in either the condemned or the purchased cases, but rather to the third party leaseholder to pay them for the value of their lease. They bought off the lease, basically. That money did not go-and even in the condemned property, which we're assuming for purposes of this analysis that the condemned properties were treated fairly, they went through a judicial process and we have to assume, if this valuation extends, that the condemned property owners were treated fairly. *Well, even in the condemned property sense, those properties were treated as having the highest and best use as agricultural, residential farmland. That's how they were evaluated. That's how they were valued. The lease payment that was made to these third party oil and gas companies doesn't go to the landowner, it goes to pay off the lease. Well, the same is true for the purchased properties.* Those, as we understand it-and again, we have not been able to locate the appraisal reports themselves if they were actually generated. *They were treated as having highest and best use as agricultural, residential. For those properties that had a lease arrangement with a third party oil and gas company, that amount of the oil and gas lease was paid not to the landowner, but to the third party oil and gas company.* We believe that if we're going to go through this analysis, that fact needs to be taken into consideration because that amount of money, first of all, was not going to the landowners themselves. So it doesn't make sense, in the government's opinion, to include that when we're comparing these apples to apples. But perhaps more fundamentally, the *congressional reference only provides relief to those individuals who owned properties for which the United States refused to compensate for mineral, oil and gas rights. Well, based on the fact that the condemned properties were treated the same way as the purchased properties, we believe that there's really no evidence, at least at this point, that we've seen, that the property owners that voluntarily sold were treated any different than the property*

*owners that were condemned.* Those are the three main points that we noticed, the problems that we've had with at least the principal amount, the $14 differential. We went through the analysis and we came out with approximately a $7 per acre differential if we take those three elements into consideration. That would mean approximately an eight percent less payment to those properties that were purchased. We believe that's neither surprising, nor we believe statistically significant to demonstrate that the property owners that voluntarily sold were treated unfairly. (emphasis added).

TR at 30–36, 40–43.

On February 24, 2004, the court convened a telephone status conference to ascertain the results of the parties' settlement discussions. Plaintiffs' counsel indicated that the Government did not commit to any "concrete numbers" and asked for a trial date, which the court set for September 8–11, 2004. The court encouraged the parties to continue discussions and advised them that either Judge Christine O.C. Miller or Judge Eric G. Bruggink were available to pursue Alternative Dispute Resolution. On February 25, 2004, the Government filed a Memorandum addressing Plaintiffs' claim for the entitlement of interest on any award based on the Just Compensation Clause of the Fifth Amendment to the United States Constitution. Another telephone status conference was held on April 13, 2004.

On May 18, 2004, the parties filed a Joint Pre–Trial Scheduling Order, entered thereafter establishing a trial date of September 1–14, 2004, together with interim deadlines for: the completion of discovery; the filing of briefs; final witness lists; final exhibit lists; and any objections to same. On May 20, 2004, the court entered a Scheduling Order and setting a trial in Owensboro, Kentucky for September 8–14, 2004.

Although Plaintiffs issued a First Set of Interrogatories and Request for Production of Documents on May 14, 1994, the Government did not file a Response until May 26, 2004. In response to almost every request, the Government stated:

Due to the fact that the real estate involved in this lawsuit was acquired by the federal government several decades ago, a full and complete answer to this interrogatory is not now possible. It is believed that some of the documents generated as a result of these real estate acquisitions and related to these real estate acquisitions has been archived, and would, therefore, be a matter of public record. It is also possible that some of the documents generated as a result of these real estate acquisitions and related to these real estate acquisitions have been destroyed, in accordance with federal agency document-handling policies.

The Government also advised Plaintiffs about the location of documents in the Federal Records Center and National Archives in East Point, Georgia, and National Archives in Chicago, that were not produced at the time the Government proffered 20 binders consisting of the "Administrative Record in 1995 or 1996." *See* Gov't Post–Trial Memo App. at Tab 10; *see also* March 11, 2005 Declaration of William J. Shapiro at ¶¶ 4–5, 30.

On or about May 26, 2004, the Government responded to Plaintiffs' First Set of Interrogatories and document request. On or about June 9, 2004, the Government responded to Plaintiffs' Second Set of Interrogatories and second document request.

On July 19, 2004, the Government filed a Motion to Strike Plaintiffs' Witnesses and to Compel Production of an Amended Preliminary Witness List and for an Extension of Time to Complete Depositions. On July 22, 2004, Plaintiffs filed a Response to the Government's July 19, 2004 Motion to Strike, together with a Supplemental Response. On July 22, 2004, the court convened a telephone status conference with the parties. On July 26, 2004, the court entered an Order denying the Government's July 19, 2004 Motion to Strike Plaintiffs' Witnesses or, in the Alternative*, to Compel and a Motion for an Extension of Time to Complete Depositions of Plaintiffs' Witnesses as moot. That Order also set a pre-trial conference for September 1, 2004 and advised the parties that in light of a June 30, 2004 Memorandum from the Committee on the Judicial Branch of the

Judicial Conference of the United States directing that all unnecessary court travel be suspended due to budgetary considerations, the trial would be held in Washington, D.C. and commence on September 8, 2004 and continue through September 10, 2004, at which time Plaintiffs were to begin by proffering their expert witnesses.

On August 9, 2004, Plaintiffs filed a Motion for Leave to File Deposition Transcripts of the five former owners of the property purchased by the Government in 1942–1944 to form Camp Breckinridge. These depositions were taken in the summer of 1995, but three of the deponents were deceased. On August 9, 2004, Plaintiffs also filed a Memorandum of Contentions of Fact and Law, Final Witness List, and Final Exhibit List. On August 13, 2004, the Government filed a Motion in Limine to Exclude Hearsay in Plaintiffs' Exhibit Numbers 8 and 54 and a similar Motion to Exclude Plaintiffs' Exhibit Numbers 122–233, together with a set of 15 exhibits; and a Motion to Bar Plaintiffs from asserting that Government agents made oral representations to induce the sale of land for use in establishing Camp Breckinridge. In addition, on August 13, 2004, the Government filed a Pre–Trial Memorandum, Trial Exhibit List, and Expert Witness List and Response to Plaintiffs' August 9, 2004 Motion to File Deposition Transcripts and Cross Designation. On August 20, 2004, Plaintiffs filed Objections to the Government's Pre–Trial Memorandum, Witness List, and Exhibit List.

On August 31, 2004, Plaintiffs filed a Response to the Government's Motion to Exclude Exhibits 8 and 54. On that date, Plaintiffs also filed a Response to the Government's Motion In Limine Regarding Government Agent Oral Representations. In addition, on August 31, 2004, Plaintiffs filed a Response to the Government's Motion in Limine to Exclude Affidavits executed in 1979.

On September 1, 2004, the court convened a telephone pre-trial conference. On September 8–10, 2004, an evidentiary hearing was held in Washington, D.C.[31]

On October 1, 2004, the court convened a telephone status conference, at which time the Government was directed to proffer the direct testimony of any experts by November 15, 2004. Another status conference was set for November 18, 2004, until which time the parties were allowed to complete depositions. The evidentiary hearing was set to be continued on November 22–23, 2004.

On October 6, 2004, Plaintiffs' expert, Dr. Charles F. Haywood, filed an Amended Report and Additional Direct Testimony.[32] On November 12, 2004, the Government filed a Motion in Limine to Exclude and Strike Dr. Haywood's October 6, 2004 Amended Report and Additional Direct Testimony and to Strike Dr. Haywood's Trial Testimony, together with 11 Exhibits in Support. On November 15, 2004, the Government filed a Submission of Expert Witness Direct Testimony. On November 18, 2004, the court convened another telephone status confer-

31. At the hearing, the Plaintiffs' expert was: Dr. Charles F. Haywood, a former Dean of the College of Business and Economics and Professor of Economics and Finance of the University of Kentucky about the "appropriate rate of interest to translate the 1942 dollars ... to 2004 values." TR at 16.

The Government's expert witnesses were: Dr. Leland Johnson, Research Historian at Vanderbilt University and "expert in 20th Century American History, with a particular expertise in the history of the Army Corps of Engineers." TR at 204; Dr. Jay Brigham, a Historical Researcher with Morgan Angel and Associates, Washington, D.C.; and Mr. Michael S. Davis, Chief of the Real Estate Acquisition, Great Lakes and Ohio River Division, U.S. Army Corps of Engineers.

32. At the direction of the court, Dr. Haywood filed an Amended Report and Additional Direct

Testimony (*see* Haywood Amended Rep. at 1) to take into account information received after Dr. Haywood's Direct Testimony initially was filed on July 21, 2004. The purpose of Dr. Haywood's Amended Report and Additional Direct Testimony was to establish: "(1) the amount of a 'differential' between what the Claimants actually received ... and what they should have received as 'just compensation' in 1942; and (2) the amount by which any such 'differential' in 1942 dollars should be increased to account for the delay in payment for what is now some 62 years." Haywood Am. Direct at 1. Dr. Haywood recommended that the court adopt the second "fair compensation" methodology because of the 62 year period claimants have been deprived of their property, the "persistence of inflation" thereafter, and the profit received by the Government in 1966. *Id.* at 7.

ence. On November 23, 2004, the evidentiary hearing [33] was reconvened.[34]

On December 9, 2004, Plaintiffs filed Rebuttal Testimony of Dr. Charles F. Haywood. On December 10, 2004, the Government filed a Motion to Strike Dr. Charles F. Haywood's Rebuttal Testimony and Supplemental Exhibit List. On December 13, 2004, the court convened another telephone status conference with the parties.

On December 17, 2004, Plaintiffs filed a Motion Regarding Trial Exhibits proffering Appendix A, consisting of 55 Affidavits executed by former landowners or their heirs primarily during September 21, 1978–March 9, 1982. The Government responded on the same date. On December 27, 2004, Plaintiffs filed a Response to the Government's December 10, 2004 Motion to Strike the Rebuttal Testimony of Dr. Haywood. On that same date, the Government filed a Reply.

## L. 2005.

On January 3, 2005, the Government filed a Renewed Motion to Strike the Rebuttal Testimony of Dr. Charles F. Haywood. On January 13, 2005, Plaintiffs filed a Response thereto. On January 24, 2005, Plaintiffs filed a Post–Trial Brief with an Appendix of Exhibits. On that same date, the Government also filed a Post–Trial Memorandum with an Appendix of Exhibits. On January 28, 2005, Plaintiffs filed a Cross–Designation of the Deposition of Ruby Higginson, filed by leave of court.

On February 14, 2005, the Government filed a Motion for Leave to File a Response to Plaintiffs' Post–Trial Brief. On February 18, 2005, the court granted the Motion.

On March 2, 2005, by e-mail, the court requested information from the parties concerning the GSA sale of land in 1964–1965. On March 7, 2005, the Government filed a Response providing the court with:

Court Ex. 3A: February 11, 1965 letter to John W. Carley from Howard Greenberg amending January 15, 1965 Use and Occupancy Agreement allowing the Office of Economic Opportunity to use portions of Camp Breckinridge; January 15, 1965 letter setting forth Use and Occupancy Agreement between GSA and the Office of Economic Opportunity; the following GSA news releases: June 6, 1967; June 20, 1967; August 24, 1967; December 28, 1967; October 9, 1968; November 5, 1968; January 23, 1969; and April 11, 1969; February 23, 1968 Real Property Disposal Activities Control Report; November 29, 1978 letter from Paul E. Goulding, Deputy GSA Administrator, to Carroll Hubbard; October and November 1978 letters from GSA Commissioner Roy Markon to Louis D. Robards, Albert Martin, Mark and Eleanor Martin, Robert Hoffman, John Will Griggs, Carroll Hubbard, Romano Mazzoli, Gene Snyder, Jessie Wood, Kathryn Buchanan, Edna Lynn, Robert E. Martin, and Eueraline Lancaster informing them that GSA would not open an investigation into the disposal of Camp Breckinridge land.

Court Ex. 3B: Advertisement, Notice of Auction Sale, and Offer to Purchase form for February 25, 1967 auction of 48 parcels (600 acres) of Camp Breckinridge land.

Court Ex. 3C: Invitation to Bid, Notice to Prospective Bidders, Bid Form, and Instruc-

---

**33.** The record includes the following exhibits, admitted either during the September 8—10, 2004 and November 23, 2004 evidentiary hearings, or included by the parties in submissions to the court: Claimant's Trial Exhibits ("CX") 10; CX 11; CX 12; CX 13; CX 14; CX 15; CX 17; CX 19; CX 20; CX 21; CX 22; CX 23; CX 24; CX 25; CX 26; CX 27; CX 33; CX 34; CX 36; CX 37; CX 38; CX 39; CX 40; CX 41; CX 42; CX 43; CX 44; CX 45; CX 50; CX 52; CX 53; CX 77 and 77a; CX 122–232; CX 244; CX 246; CX 245; CX 260–84; Joint Trial Exhibits ("JX") 1–684; Defendant's Trial Exhibits ("DX") 1–614; Court Exhibits ("Court Ex.") 1–4, including Exhibits attached to the Government's March 11, 2005 Response to the Court's March

2, 2005 Email Correspondence (Court.Ex. 3A–3I); Exhibits attached to the March 18, 2005 Declaration of William J. Shapiro; Exhibits in Support of Defendant's August 13, 2004 Motion in Limine, Tabs 1–15; Exhibits attached to Defendant's January 24, 2005 Post–Trial Memorandum, Tabs 1–10; and Exhibits attached to Appendix Supporting Claimant's January 25, 2005 Post–Trial Brief.

**34.** At the November 23, 2004 hearing, the Plaintiffs' expert, Dr. Charles F. Haywood, offered testimony on cross-examination, re-direct, and re-cross examination.

tions to Bidders for October 25, 1968 sale of 102 Camp Breckinridge buildings.

Court Ex. 3D: Advertisement, Invitation to Bid, Notice of Auction Sale, and Bid Form for March 1, 1966 auction of 35 parcels (22,300 acres) of Camp Breckinridge land.

Court Ex. 3E: Advertisement, Notice of Auction Sale, and Bid Forms for February 26, 1969 auction of two parcels of Camp Breckinridge land.

Court Ex. 3F: Advertisement, Notice of Auction Sale, and Bid Forms for November 14, 1968 auction of two parcels (159.5 acres) of Camp Breckinridge land.

Court Ex. 3G: Invitation for Bids, Bid Form, and Terms of Sale for January 14, 1972 auction of one parcel (4.220 acres) of Camp Breckinridge land.

Court Ex. 3H: Invitation for Bids, Terms of Sale, and Bid Form for August 22, 1967 auction of six chapel buildings on Camp Breckinridge land.

Court Ex. 3I: Invitation to Bid, Terms of Sale, and Bid Form for September 29, 1967 auction of coal rights on three tracts (4,900 acres) of Camp Breckinridge land.

Court Ex. 3J: Advertisement, Notice of Auction Sale, and Bid Form for September 30, 1965 auction of nine parcels (3,923 acres) of Camp Breckinridge land.

Court Ex. 3K: Advertisement, Notice of Auction Sale, and Bid Form for May 5, 1967 auction of two parcels (1,100 acres) Camp Breckinridge land.

Court Ex. 3L: Invitation for Bids, Terms of Sale, and Bid Form for January 31, 1968 auction of six chapel buildings on Camp Breckinridge land.

On March 11, 2005, the court ordered the Government to provide the court with an affidavit of counsel stating that: The Government has searched for all documents concerning land acquired in Henderson, Union, and Webster Counties by the Government in 1942, pursuant to Declarations of Takings issued by the Secretary of War, as well as the subsequent sale of that land and the sale of coal, gas, oil, and other mineral rights attendant thereto, maintained by the General Services Administration, the Department of the Interior, the Department of Defense, and all United States National Archives and Records Administration facilities; and the Government has provided the court with all the documents described in paragraph 1 herein that have been located through the Government's search. On March 18, 2005, the Government filed the Declaration of William J. Shapiro, together with Exhibits A–I.

On March 23, 2005, by e-mail, the court requested information on the amount the Government was paid in 1967 for coal rights on Tracts 1, 7A, and 7B. On March 24, 2005, the Government filed a Response and Motion to Limit Review to the Trial Record. On March 25, 2005, the court denied the Government's Motion to Limit Review to the Trial Record and requested production of the documents by March 31, 2005.

## III. DISCUSSION

### A. Jurisdiction.

Congress authorized the United States Court of Federal Claims with jurisdiction under the Tucker Act to render judgment and money damages on any claim against the United States based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); *see also United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). A plaintiff, however, must identify and plead an independent contractual relationship that provides a substantive right to money damages for the court to have jurisdiction. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

In addition, Congress authorized the United States Court of Federal Claims with jurisdiction under 28 U.S.C. § 2509 "to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy ... and inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount[.]" *Id.* at § 2509(c).

The First Amended Complaint seeks the court's exercise of jurisdiction under both 28

U.S.C. § 1491(a)(1) and 28 U.S.C. § 2509(c). *See* Sept. 22, 1995 First Amended Compl. at ¶ 1 at 21.

### B. Standing.

■ To establish injury in fact, plaintiff must have suffered: "an invasion of a legally protected interest which is (a) concrete and particularized *and* (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added) (internal citations omitted).

In this case, Plaintiffs have "legally protected interests" in their former land, including coal, gas, oil, and other mineral rights and the 1942–1944 contracts with the Government, which allegedly were "invaded" or adversely affected. *See, e.g., Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 138, 59 S.Ct. 366, 83 L.Ed. 543 (1939) (holding that a claim based on the invasion of a legal right includes "one of property [and] one arising out of contract"); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19, n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); *Cienega Gardens v. United States*, 331 F.3d 1319, 1328–31 (Fed.Cir.2003) (same); *see also Kelo v. City of New London*, 268 Conn. 1, 843 A.2d 500 (2004) (*cert. granted*, 73 USLW 3204, 125 S.Ct. 27, 159 L.Ed.2d 857 (U.S. Sept. 28, 2004)) (No. 04–108) (to determine the limits of the "public use" requirement of the Fifth Amendment to the United States Constitution when the Government takes land).

The burden on Plaintiffs is to evidence "specific facts," establishing that a recovery is "concrete" and "particularized." *See Defenders of Wildlife*, 504 U.S. at 560–61, 112 S.Ct. 2130. As discussed herein, Plaintiffs have met both of these standing requirements in this case.

### C. Standard of Review.

■ The United States Court of Federal Claims has held:

the words "legal claim" as used in the congressional reference statute imply no

special meaning beyond the conventional understanding of that term: a claim based on the invasion of a legal right, that is "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege."

*Spalding & Son, Inc. v. United States*, 28 Fed.Cl. 242, 247 (1993) (quoting *Tenn. Elec. Power Co.*, 306 U.S. at 137–38, 59 S.Ct. 366); *see also* 28 U.S.C. § 2509(c); *Banfi Prods. Corp. v. United States*, 40 Fed.Cl. 107, 121 (1997), *affirmed as modified*, 41 Fed.Cl. 581 (1998); *INSLAW, Inc. v. United States*, 35 Fed.Cl. 295, 302 (1996). To qualify as a legal claim, the claim must be viable in all respects, *i.e.*, not be barred by the statute of limitations or by some other sovereign immunity defense. *See Kanehl v. United States*, 40 Fed.Cl. 762, 771 (1998).

In the alternative, a claimant may be entitled to monetary relief from Congress, if the United States Court of Federal Claims determines that there has been "some unjustifiable governmental act that has caused damage to the claimants." *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986); *see also* 28 U.S.C. § 2509(c). The qualitative measure of an equitable claim requires claimants to establish a wrongful or negligent act. *See Banfi Products Corp.*, 40 Fed.Cl. at 121–22 (quoting *Spalding*, 28 Fed. Cl. at 250) ("Absent a finding of negligence [or wrongdoing] on the part of [the Government], any award ... would be a gratuity.").

■ The United States Court of Federal Claims also may find that the demand amounts to no more than a gratuity grounded in conscience, ethics, or morals, rather than in positive law. *See Banfi Prods. Corp.*, 40 Fed.Cl. at 121–22; *see also* 28 U.S.C. § 2509(c); *Kochendorfer v. United States*, 193 Ct.Cl. 1045, 1055, 1970 WL 6465 (1970) (holding that a claim for a gratuity nevertheless "must rest on some unjustified act or omission [of the Government] that caused the claimants' damage.").

### D. Arguments Of The Parties.

#### 1. Plaintiffs' Argument.

Plaintiffs' principal legal argument was that the "manner in which the United States

secured 'voluntary sales' of the farms of Claimants' ancestors ... resulted in a violation of the Fifth Amendment to the United States Constitution." Jan. 24, 2005 Claimants' Post–Trial Brief at 46; *see also id.* at 46–47. The alleged lack of "just compensation" is argued to be apparent by comparing the amounts paid to the original landowners who voluntarily sold their properties to the Government in 1942–1944 with the amounts awarded as a result of jury trials. *Id.* at 47. Plaintiffs further argue that they are entitled not only to the difference between the purchase price obtained through voluntary sales versus jury trial awards, but also some measure of interest so that just compensation is achieved. *Id.* at 52–58; *see also* CX 260 (Amended Direct Testimony of Dr. Charles F. Haywood, Expert).

In addition, Plaintiffs argued that "coercive tactics" by the Government violated "legal and equitable standards." *Id.* at 50. Although Plaintiffs do not discuss the theoretical basis for this argument, the court assumed this argument was akin to claiming that the 1942–1944 contracts should be declared void on public policy grounds. *Id.* at 50–52.

### 2. Government's Argument.

The Government first argued that the terms of the reference S. 794 control the court's jurisdiction and is not expanded by S. Res. 98, which is a vehicle that refers Senate Resolution. *See* Gov't Post–Trial Brief at 11–14; *see, e.g., Hart v. United States,* 58 Ct.Cl. 518, 538, 1923 WL 2098 (1923) ("The resolution referring the bill to this court merely had the effect to transmit the bill and the claim to the court for action as otherwise provided by law."). Accordingly, the Government argued that both premises set forth in S. 794 must be satisfied before the court may recommend to Congress an amount that may be due to Plaintiffs. For the reasons discussed herein, the court has determined that the record in this case establishes that both premises of S. 794 have been met.

The Government's primary argument on the merits is that Plaintiffs failed to prove entitlement to a legal claim "*under any legal theory.*" *See* Gov't Post–Trial Brief at 115 (emphasis added) (relying primarily on Plaintiffs' counsel's statement at trial that, "We do not have a legal claim in this case." TR at 160.). Based on this statement, the Government asserts that Plaintiffs have waived any legal claim. *See* Gov't Post–Trial Brief at 11.

First, the Government failed to request an admission from Plaintiffs regarding their entitlement to relief pursuant to a legal claim, pursuant to the rules of the court. *See* RCFC 36. Second, the evidence adduced rendered counsel's argument premature since the record had not been made at that point. Since RCFC 15(b) affords plaintiff the opportunity to amend a complaint to conform to and with trial evidence, *ipso facto,* statement of counsel in argument early in trial that is not proffered as an admission does not have the legal effect of a waiver.

The Government also asserts that the legal defenses of statute of limitations and preclusion, as preserved in the Government's October 30, 1995 Answer to Plaintiffs' First Amended Complaint, Third Defense, Fourth Defense, and Sixth Defense at 44, bar recovery of any legal claim. *See* Gov't Pre–Trial Mem. at 20–28; Gov't Post–Trial Brief at 116–17. In the alternative, the Government asserts that any equitable claim is barred by the doctrine of laches. *See* Gov't Pre–Trial Mem. at 32–36; Gov't Post–Trial Brief at 118–24.

### E. The Court's Determination.

**1. The Government Did Not Breach 1942–1944 Contracts, Even If Federal Agents Advised The Former Landowners That They Would Receive A Preference To Repurchase Their Property And/Or At A Special Price.**

The court reviewed each of the videotape and other depositions,[35] affidavits,[36] and an-

---

**35.** On July 13–14, 1995, former landowners were deposed. At that time, the deponents' ages ranged from 77–87 years old. On August 13, 2004, the Government filed a motion to exclude Plaintiffs' August 9, 2004 motion to file certain

deposition transcripts. In addition, after trial, the Government provided the court with a detailed argument that none of the 1995 depositions supported claimants' allegations either because of failed memory, confusion about past

events, and, in any event, the depositions should be excluded from the record as hearsay. *See* Gov't Post–Trial Brief at 81–88.

The depositions of former landowners are not excluded as hearsay, if the declarant is unavailable as a witness and "[t]estimony [was] given . . . in a deposition taken in compliance with law in the course of the same . . . proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

The depositions proffered by Plaintiffs were taken in this proceeding and the Government participated and conducted cross examination in each. Therefore, the depositions are admissible since the deponents either were no longer alive or unavailable by reason of health or age.

The court found that each deponent testified in a cogent and persuasive manner.

*See* CX 270 (Sept. 21, 2004 John E. Johnson Dep.) at 6–7 (Mr. Johnson's mother and father owned approximately 100 acres and Mr. Johnson's grandparents owned approximately 40 acres in Union County, all acquired by the Government in 1942.); *see also id.* 11, 69 (Mr. Johnson was 10 years old and with his father when a government representative stated: "Just think, after the war is over with, you'll be able to buy this at a fraction of the cost of what the government is paying you."); *see also id.* at 13 ("It was well-known throughout the community that, you know, they were going to get their farm back.").

*See* CX 272 (July 13, 1995 William Logan Newman Dep.) at 3–6 (In 1942, Mr. Newman was 24 years old when the Government purchased by condemnation two tracts of land in Webster County (Tract Nos. E–14, E–28) consisting of 223 acres and a half interest in another tract in Union County from Mr. Newman's parents. In addition, Mr. Newman's father and cousin also jointly inherited another 65.4 acres from another relative that was acquired by the Government by condemnation.). *Id.* at 8–9 (Newman's father told him that a Mr. Meyers from Ohio told his father that: "they was supposed to get [the land] back when they got through training of the soldiers there.").

*See* July 13, 1995 Mrs. Iloff (Eulah P.) Tilley Dep. at 34–35 (Mrs. Tilley testified that she and her deceased husband owned approximately 32 acres in Union County that was acquired by the Government in 1942, but "[i]t was always understood we'd get [the land] back when the war was over. That was understood all the way through . . . all of them left the impression we'd get it back when the war was over.")

*See* CX 273 (July 14, 1995 Mrs. Thomas Raymond (Lottie Mae) Lynn Dep.) at 10 (Mrs. Lynn and her deceased husband owned 45 acres (Tract E–647) in Webster County on which they lived and farmed.); *see id.* at 10 (Mrs. Lynn testified that: "[T]hey come and told us what they'd give us for it. And they said we could have it back after the war was over. And so we didn't put up a big fuss because it was the government[.]"); *see also id.* at 17 ("Well, they promised to let us have it back when the war was over and they didn't even let us know they declared it surplus and put it up and sold it at auction.").

*See* CX 274 (July 14, 1995 William B. Caton Dep.) at 4–6, 12–19, 22–24, 50–52, 65–66 (Mr. Caton testified that in 1942, he owned 53 acres in Union and Webster counties; Mr. Caton's mother, Kathryn Caton, owned 50 acres in Union County; and his father, Eldon Caton, owned approximately 110–20 acres in Union County (Tract E–168). Mr. Caton's grandmother, Ella, also owned an additional 52–53 acres in Union County.); *see also id.* at 15–17 (After the condemnation, Mr. Caton sold his land for $2,730.00 and moved with his family to Corydon, Kentucky.); *see also id.* at 6–8 (Mr. Caton testified that he is an heir to the estate of all of his relatives and was 28 years old when he heard Mr. Pete West and other government officials represent that the land could be bought back after the war.).

*See* CX 275 (July 14, 1995 Mrs. Spaulding (Mary Virginia) Dixon Dep.) at 14 (Mrs. Dixon testified that she and her deceased husband owned 50 acres in Union County used for farming that was acquired by the Government by condemnation in 1942. Mrs. Dixon's father-in-law, William Wallace Dixon, owned a 200–acre farm in Union County that also was acquired in 1942 by condemnation.); *see also id.* at 53 (Mrs. Dixon testified that she was present, the second time, that the "government man" met with her husband, at which time he was advised "after the war was over and they were through with the land, we had first chance to buy it back if we wanted to . . . Well, he was from the government. I thought you trusted them.").

*See* CX 276 (July 14, 1995 Mrs. William Walter (Kathryn) Pullum Dep.) at 6–14, 23–24, 35–36 (Mrs. Pullum testified that she and her husband lived on a 105–acre farm that was acquired by the Government in 1942 by condemnation for $76 per acre. Her father-in-law, John Pullum, had a 100–acre farm and her sister-in-law, Emma Gertrude Pullum–Cummins, owned two farms amounting to approximately 200 acres, both of which also were acquired by the Government by condemnation in 1942.); *see also id.* at 6–8 (Mrs. Pullum testified that she is an heir to her father-in-law's estate that was acquired by the Government in 1942 by condemnation and that "I heard [the government representative] tell my husband that we would have first chance to buy the land back when they were finished with it[.]").

In the summer and fall of 2004, other witnesses who were living in Henderson, Union, and Webster counties during 1942–1944 were deposed. The court also reviewed each of these depositions and found that each of the deponents testified in a truthful manner. *See, e.g.,* CX 263 (July 21, 2004 Herbert F. Hoffman Dep.) at 8–9 (Mr. Hoffman testified that during the period of October 14, 1942–November 29, 1942, Hoffman was working with the land acquisition team when he heard government land officers promise landowners "'if on any occasion we no longer need [the land], you'll be the first one to have the chance to get it back.'"); CX 271 (Oct. 1, 2004

Peyton Heady Dep.) at 7, 68–70 (Mr. Heady testified that when he was a Clerk in the Office of the Mechanical Engineer Division at Camp Breckinridge the "acquisition agent told me ... these farmers will get their land back after this camp is closed."); CX 268 (Oct. 4, 2004 Carl Culver Dep). at 14–15, 77 (Mr. Culver testified that he was living with his two elderly aunts and managing their farm when they were advised of the condemnation, "They were very sad, and they told me that the government agent was there, and he was going to take their farms.... He told them that they could purchase their land back when the government no longer used the land, or it was surplus. If they wasn't living, that the heirs would have the same chance. We believed that. Every neighbor that was within the boundary told us, that's what they told us, well, that we could buy our land back at the same price whenever it became surplus."); CX 269 (Oct. 5, 2004 Robert H. Bruce Dep.) at 12 (Mr. Bruce testified that the common "understanding was that the land as such could be repurchased by the original owner when it became available.").

**36.** The court also reviewed each of the affidavits submitted by Plaintiffs, many of which were handwritten. Although most of the affiants appeared to understand the significance of their sworn statements, some did appear confused. On August 13, 2004 the Government filed a Motion in Limine to exclude all of the Affidavits (Exhibits No. 122–233) of former landowners or their heirs. In addition, after trial the Government provided the court with a detailed argument as to why the affidavits should be excluded as hearsay or otherwise were unreliable information. *See* Gov't Post–Trial Brief at 71–81.

The affidavits of former landowners, their heirs, and others that participated in the 1942–1944 condemnations are hearsay and generally are not admissible as evidence. *See* Fed.R.Evid. Rule 802. The court has determined, however, that the affidavits proffered in this case are nevertheless admissible in that they satisfy the requirements of the residual exception set forth in Fed.R.Evid. Rule 807, *i.e.*, "(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." *See also* Fed.R.Evid. 804(b)(4) (Statements of a declarant "are not excluded by the hearsay rule if the declarant is unavailable as a witness ... [and the statement is one] concerning the declarant's own ... family history, even though declarant had no means of acquiring personal knowledge of the matter stated."). The Government received the affidavits in March 2004 and had sufficient notice in advance of trial of Plaintiffs' intent to proffer these affidavits to meet them. In fact, the Government's experts were retained, in part, to rebut these affidavits. Moreover, the court has determined that the

trustworthiness of the affidavits is demonstrated by the totality of the circumstances under which they were executed, *i.e.*, not for litigation, but to persuade members of Congress to pass legislation to compensate the former landowners or their heirs for losses arising from the condemnation of their property in 1942–1944. *See Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (holding trustworthiness "must ... be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. Our precedents have recognized that statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testimony would add little to their reliability.").

Therefore, the court has cited or relied herein only the affidavits the court considered credible and reliable. *See, e.g.*, CX 126 (March 29, 1979 T.J. Tapp Aff.: "At this time the Government ... told Mr. Tapp that when they were through with the land, that the landowners would be allowed to get their land back[.]"); CX 133 (March 1, 1979 James L. Wathen Aff.: "We (children) repeatedly overheard our father (J. B.Wathen) and his brother J.A. Wathen that they would have the first option to buy back the land when the war (W.W.2) was over."); CX 141 (March 6, 1979 H.D. Payne, Sr. Aff.: "[A]ffiant was present and heard government agents state to his father, W.T. Payne, that after he had sold the property to the government for the army camp that after the war he would be allowed a chance to buy the property back at close to the price paid for it by the government."); CX 142 (March 12, 1979 Mrs. Benton O'Nan Aff.: Mrs. O'Nan and her husband "were told by the Government Purchasing Agent that ... when the land was no longer needed as an army camp, that they would have the first option to repurchase the land from the government at the same Eighty-seven Dollars and 50/100 ($87.50) per acre."); CX 143 (Feb. 4, 1979 Albert Martin Aff.: "[W]e were told that we would get our land back in five years, also said we might get it back cheaper than we got, we held to that hope for a long time."); CX 144 (Feb. 23, 1979 John J. Brooks, Jr. and Anne E. Brooks Aff.: "The promise [was] that it would be sold back to original owner."); CX 147 (Feb. 15, 1979 Ruth G. Henshaw Aff.: Grandparents, John Minor and Mary Virginia Griggs, "were promised they could buy this land back when the war was over and Camp Breckinridge was no longer needed. This was the most gross misrepresentation the government made."); CX 148 (March 8, 1979 Gerald E. Griggs Aff.: "were promised they could buy this land back when the war ended and Camp Breckinridge was no longer needed. This was the most gross misrepresentation the government ever made."); CX 149 (Feb. 15, 1979 Benny Griggs Aff.: "After war, landowner was to be given first chance to purchase land at a reasonable price."); CX 152 (Nov. 7, 1994 Clara Evelyn Griggs Aff.: "The Griggs family was told that ... the land could be repurchased after the war was over and consequently, they should go

without complaint.... It is difficult to remember events that occurred fifty years ago. But the despair and heartache of that time will never be forgotten as will the loss of faith in the honesty, intregrity [sic], and word of the U.S. government and its representatives."); CX 155 (Aug. 17, 1979 Russell Holeman Aff.: stating first option to re-purchase land was "second hand information as I was a minor at the time."); CX 163 (March 15, 1979 Donald L. Bullock Aff.: "Our father is now deceased and mother is in rest home because of old age and mental confusion. We were told by our father that he was told he would be given first chance at buying property back."); CX 164 (March 3, 1979 Mrs. N.O. "May" Denton Aff.: "The government agents informed them that they would have the first option to repurchase the land after the war ended."); CX 167 (Sept. 21, 1978 Clifton E. Blue Aff.: "I was told the govern-ment wanted the land for military purposes only. We were told when the war was over we would get our land back at the same price paid less damages."); CX 168 (March 15, 1979 Ruth Rus-sell Aff.: "Mr. Pete West told my father that he would get his farm back after the war.... My father bought another farm but when Breckin-ridge was closed he sold it so he would have cash to buy his farm back. The land became available for lease in Jan. 31, 1947. He then leased it for 5 years, hired a bull dozer and cleared the land that had grown in bushes and trees—cleared artillery shells and leveled excavation dug by Army. After one harvest the lease was cancel[ed] by the War Depart. with no reimbursement of lease money. This caused my father to have ulcers and went into a state of depression which he was never well again. Died with a broken heart at the age 83 years–1962. 20 yrs of ago-ny."); CX 169 (Feb. 16, 1979 Jessie Russell Wood Aff.: "April of 1942 an appraiser came looked at the house and told us to go to Morgan-field and sign some papers and when the war was over we could have our home back."); CX 170 (March 9, 1982 Elvis Stone Aff.: "The man in the office told me that when the war was over and the camp was no longer needed we could have the land back at a fair price[.]"); CX 172 (March 15, 1979 Stanley Nelson Aff.: indicating that the Government said he could purchase his farm after the war); CX 173 (Feb. 16, 1979 Hassie Tilley Adamson Aff.: "We were verbally promised our farm back when the government was through with it, but we never got the chance to even buy it back several years later."); CX 178 (May 21, 1979 Lillie White Riggs Freer Aff.: indicating the Government said could purchase farm back after war); CX 179 (undated Polly Puryear Brown Aff.: "My father (Payton Pur-year) said the agent (whose name we don't re-call) told him we should accept the Gov't offer of $119 an acre and we would receive first option to buy the land back."); CX 180 (March 13, 1979 Mr. and Mrs. Payton Puryear Aff.: indicating opportunity to purchase farm after war); CX 182 (Feb. 6, 1979 Mrs. Joe (Caroline) N. Greenwall Aff.: "They said we could have it back after the war was over or at least in twenty years for what they gave us less depreciation."); CX 183 (Feb.

13, 1979 Robert G. Greenwell Aff.: "We were told we could repurchase the land at purchase price minus depreciation. But when the time came we were not allowed to purchase the land back."); CX 185 (Feb. 13, 1979 Mary Lois Spencer Caton Aff.: "[M]y father was told he would have first option to repurchase the land. He bought two different farms but sold them so as not to have his money tied up when his original farm was offered for sale. The land was never put up for repurchase but auctioned off[.]"); CX 190 (March 2, 1979 A.J. Gibson Aff.: indicating his family's farm could be purchased after the war); CX 196 (March 15, 1979 Vende-line Nelson Aff.: indicating that the government said the farm could be repurchased after the war); CX 197 (March 6, 1979 Jewell Duncan Aff.: "The government appraisers told us after the war when the camp was no longer needed we would have first chance to purchase our farm."); CX 202 (Oct. 11, 1979 Mary Catherine Bell Reyn-olds Aff.: "Since I was only eight years old at the time Camp Breckinridge was planned, my knowledge of the negotiations on our farm is sketchy. I do know, however, without any ques-tion, that my mother often told me that the government buyers had assured her that the farm would only be used for the duration of the war, the government had no further use for the land and that it would be returned to us at the close of the war.... We recognize that the change in our way of life, our ... livelihood being wrenched away cannot now be altered. Yet the high-hand-ed way our farm was taken, and the lies about recovery which were told, are absolutely inexcus-able, particularly from the U.S. government."); CX 203 (Feb. 9, 1979 Blanche B. Banks Aff.: "Men from Corp. of Engineers said she would have the first bid to buy back the two (2) Farms at which time the Government did not need it. Also, the[y] stated that if anyone else got more money she would also, which she didn't.... I feel that all years that my father and mother worked was taken completely away from them. This isn't hear say I was there."); CX 204 (March 1, 1979 Thomas Woodring Aff.: "My father, Thomas Woodring, told me that he was told by the government agent that he would be able to repurchase the farm after the camp was declared surplus."); CX 205 (March 2, 1979 Lloyd H. Woodring Aff.: "My dad, Ulliss (Woodring), and I sat with Pete West, the government negotiator, at the kitchen table negotiating the acceptance of the appraised value of the farm. Pete West, a friend of Dad, said 'you or your heirs will get the first choice to buy the land back at the same price less the damages. The government will only operate the camp four to six years.' "); CX 210 (Feb. 12, 1979 Billy J. Timmons Aff.: "Had first chance to buy back.... All landowners will have first chance to purchase this land back at a fair market price if the land is ever declared surplus. (Bologna)."); CX 211 (Oct. 20, 1978 G.W. Cambron Aff.: "The affiant was present when the government land acquisition officer discussed with his late father the taking of his father's farm for Camp Breckinridge.... He also

swers to interrogatories prepared by former landowners or their heirs [37] and has absolute-

heard the land acquisition officer tell his father that he would be able to repurchase the farm after the war was over."); CX 212 (Feb. 6, 1979 Anne Luckett Cambron Sanley Aff.: "The general belief and talk at that time was that the original landowners were to have first chance to re-purchase their land taken by the Federal Government for Camp Breckinridge along with the mineral rights."); CX 213 (March 16, 1979 Elizabeth J. Steger Aff.: "[Josh Waggener] was 'promised that they could buy this land back when the war ended and Camp Breckinridge was no longer needed. This was the most gross misrepresentation the government ever made . . . and probably knew right then that it would never be done. If you can't believe in your government who can you believe ? ? ? ? ? ? ? ? ? ' ' "); CX 216 (Nov. 16, 1979 Samuel W. Steger Aff.: indicating the Government "talked with my grandfather, my mother & dad— I was not at home but in college. They related story to me" that the "heirs could repurchase" the land.); CX 218 (May 21, 1979 Annie Miller (Day) Jenkins Aff.: indicating the government told her that she could repurchase her land after the war); CX 219 (March 7, 1979 Henry V. Clements, Jr. Aff.: "We were told by the government land appraisers, when this land was condemned for the camp, that we would get it back when the war was over for the same price we had been paid for it by the government."); CX 221 (Jan. 29, 1979 Charles Russell Aff.: "[My father] was also promised first refusal when the property was sold by the government."); CX 223 (Feb. 2, 1979 Helburn Tapp Aff.: indicating the government would allow former landowners first chance to repurchase farm after war); CX 226 (May 21, 1979 Helen Whitledge Aff.: indicating that the government would allow former landowners first chance to repurchase farm after the war); CX 227 (Feb. 5, 1979 Lorene Straker Aff.: [Tempest Lynn] the former owner of 42.3 acres "was told that after the war when the camp was no longer needed that she would have first chance to purchase her farm."); CX 228 (July 16, 1979 Odessa Duncan Watson Aff.: indicating that the government told her she would be given the first option to repurchase the land after the camp was declared surplus); CX 229 (Jan. 22, 1979 Marietta Tapp Chandler Aff.: indicating the former landowner Clarence Tapp "had confidence in his government, that when the war was over he would be given the first opportunity to purchase the land back. A great injustice has been done to him and all the other land owners of that area."); CX 230 (May 21, 1979 Jess Anderson Tapp Aff.: indicating the former landowners could purchase the property back once the war was over); CX 231 (undated Kathryn Tapp Buchanan Aff.: "My parents still had hopes of getting first option to repurchase their farm. They believed in their government and trusted in the government agent to tell the truth."); CX 232 (March 25, 1979 Russell B. Babbs Aff.: "We were told, that when the war was over we would get a chance to buy the land back. . . . As I grew older, I always missed *our* place and hope I

would have a chance to buy it back as the government had promised.") (emphasis in original); CX 123 (Apr. 4, 1979 Frederick Williams Aff.: One of the appraisers stated the "general feeling of all government employees at the time, appraisers and negotiators, that the landowners would have the right to repurchase the property taken from them as soon as the property was no longer needed by the government for the war efforts.").

37. *See, e.g.,* DX 675 (May 5, 2004 Answer to Interrogatory 6: "I can only say my parents [Claude (Doc) Haleman and Leva Haleman] were told they would have a chance to have first chance to purchase the property once it was sold. However, the home, of course, was destroyed. . . . All property was sold and no one was notified to [the] best of my knowledge."); DX 677 (Answer to Interrogatory 6: "[T]he landowners were promised they could purchase the land back when they the government were finished using it at 10% less than the property owners were paid originally."); DX 678 (Answer to Interrogatory 6: "My father (I.C. Russell) told me that the land they took from our family would be able to have first choice at getting the land back."); DX 679 (Answer to Interrogatory 6: "When I was young my father (I.C. Russell) had mentioned to me that the government had taken the land to form Camp Breckinridge and that they (the families) were suppose to be able to purchase the land back but this did not happen."); DX 680 (Answer to Interrogatories 6 and 11: "[M]y grandparents always said such a promise was made. . . . My grandparents believed they were paid less for the land than it was worth. Compounding the affair was the govt's taking the land before paying for it. My grandparents had to vacate their homes and farms and borrow money in order to live. My grandfather died a broken man because of it."); DX 681 (Answer to Interrogatory 6: "I was always told all my life that there was such an arrangement made that the government did not live up to, however, this all occurred before I was born!"); DX 683 (Answer to Interrogatory 6: "I was staying with [my great aunt] . . . she told me what the representative told her [that original landowners would have a right to repurchase the property after the war] . . . [This] was something they both looked forward to."); DX 692 ("Government in oral promise said land might be returned to them."); DX 693 (Answer to Interrogatory 6: "[F]amily was told when government through with property family would get it back."); DX 694 (Answer to Interrogatory 6: "In later years I was told by family members 'that promises that owners would be given priority to repurchase' were given to owners."); DX 695 ("My grandmother . . . said they were promised land back when Camp Breckinridge closed but were never notified to get claim in and when she found out land was to be sold it was in blocks that most farmers couldn't pay the cost.").

ly no doubt that many of the landowners entered into Contracts [38] with the Government in 1942–1944 with the apparent understanding that they could repurchase their properties after World War II was concluded and, in some cases, at the same price that the Government paid for it or at a discount.[39] *See also supra* note 11. Therefore, S. 794, Section 2(1), has been satisfied by a preponderance of the evidence. Accordingly, the Government's August 13, 2004 Motion to Bar Plaintiffs From Asserting that the Government Agents Made Oral Representations to Induce the Sale of Land for Use in Establishing Camp Breckinridge is denied.

█ As a matter of law, however, a contract with the Government cannot be enforced, unless the representative who entered into or ratified a contract on behalf of the Government had actual authority to make the promise therein and bind the Government. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997) ("A contract with the United States also requires that the Government representative who entered ... the agreement had actual authority to bind the United States."). None of the Government agents, employees, or representatives in 1942–1944 had authority to promise the landowners that they would receive preference to repurchase their property after World War II, much less purchase it at a certain price. Moreover, as a matter of law, a party who enters into a contract with the Government bears the risk of "having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (holding that employee of federal crop insurer lacked authority to include coverage in an insurance contract for an item specifically excluded by federal statute). Accordingly, the landowners in this case bore that risk "even when the Government agents themselves may have been unaware of the limitations on their authority." *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir. 1998).

█ For these reasons, any representations that Government employees or agents

**38.** The documents that comprise "the Contracts" in this case between the Government and former landowners include: an option for purchase of land; a certificate of inspection and possession; an affidavit of the vendor; a warranty deed; and a receipt for the United States Treasurer's check. *See* Gov't Pre–Trial Mem. at 13–15 and representative exhibits regarding the sale of Tract No. A–15 cited therein, *e.g.*, DX 541.

**39.** *See, e.g.*, CX 270 (Sept. 21, 2004 John E. Johnson Dep.) at 11, 69 (Mr. Johnson testified that he was with his father when a government representative told his father "Just think, after the war is over with, you'll be able to buy this at a fraction of the cost of what the government is paying you."); CX 272 (July 13, 1995 William Logan Newman Dep.) at 35 ("it was opened up in great big tracts ... It was as high as 1,500 acres in one tract"); CX 275 (July 14, 1995 Mrs. Mary Virginia Dixon Dep.) at 14 ("We had first chance to buy it back if we wanted to, and I know ten percent of what they gave us for it[.]"); *see also id.* at 15–17, 51–53; CX 273 (July 14, 1995 Mrs. Thomas Raymond (Lottie May) Lynn Dep.) at 10 ("[The Government came,] they [came] and told us what they'd give us for [the land]. And they said we could have it back after the war was over. And so we didn't put up a big fuss.... But they didn't let us have it back. They didn't let us know when they declared it surplus."); Aug. 8, 1995 Eulah P. Tilley Dep. at 34–

35 ("It was always understood we'd get [the land] back when the war was over. That was understood all the way through ... all of them left the impression we'd get it back when the war was over ... minus what they moved off. We was supposed to have got it at appraisal price minus, ... the improvements that we put on it."); CX 275 (July 14, 1995 Mrs. Mary Virginia Dixon Dep.) at 14 ("[W]e had first chance to buy it back ... ten percent of what they gave us for it[.]"); CX 184 (Mar. 12, 1979 Spalding Dixon Aff: "Government man that bought [the] land advised me that after [the] war was over I would be given opportunity to buy land back at 1/10th of the original cost to the government."); CX 122 (May 25, 1979 J. Sterling Towles Aff.: "[I]n the performance of his duties as a government negotiator [he] was asked on several occasions by several of the land owners whether or not they would be allowed to repurchase the property after the war and that [he] answered them in the affirmative[.]"); CX 3C at 27 (May 28, 1942 editorial of UNION COUNTY ADVOCATE); Plaintiffs' Post–Trial Brief App. Tab G; Court Ex. 3A (Sept. 18, 1978 letter from G.W. Cambron to Jay Solomon, Investigator, GSA, stating "We the former landowners of Camp Breckinridge were promised numerous times we would get our land back after World War II ... GSA conducted the auction of this land in such enormous tracts that an individual owner could not afford to bid on their land.").

may have made about Plaintiffs' ability to repurchase their land after World War II were unauthorized and did not contractually bind the Government. Therefore, whether the former landowners had notice of the series of auctions commencing in 1966 where the surface rights were sold and the size of the acreage offered precluded repurchase of their former land are irrelevant since, as a matter of law, the Contracts also did not promise former landowners notice in the event of a resale of their former property or that the land would be sold in the same size acreage that existed in 1942–1944, when the Government acquired the land.[40]

## 2. The 1942–1944 Contracts Are Void Because They Were Based On A Mutual Mistake That No Coal, Gas, Oil, And Other Mineral Deposits Existed Under The Condemned Properties That Would Support Exploration Or Operation.

■ The RESTATEMENT (SECOND) OF CONTRACTS ("RESTATEMENT") § 152 "allows avoidance [of a contract] by the adversely affected party if [a] mistake [is] one as to a basic assumption on which the contract was made, if it had a material effect on the agreed exchange of performances, and if [the adversely affected party] does not bear the risk of the mistake." *Id.*, Int. note at 379–80. A mistake is defined as an "erroneous belief . . . The belief need not be an articulated one, and a party may have a belief as to a fact when he merely makes an assumption with respect to it, without being aware of alternatives. . . . [T]he erroneous belief must relate

to the facts as they exist at the time of the making of the contract." *Id.* § 151 at 383. Therefore, where "a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake[.]" *Id.* § 152(1) at 385; *see also* E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS (3D ED.2004) ("FARNSWORTH") § 9.3 at 595 ("A mutual mistake occurs when both parties are under substantially the same erroneous perception as to the facts.").

## a. The "Basic Assumption" On Which The Former Landowners And The Government Entered Into Contracts In 1942–1944 Was That No Coal, Gas, Oil, And Other Mineral Deposits Existed Under The Condemned Properties That Would Support Exploration Or Operations.

The "basic assumption" on which the former landowners and the Government entered into Contracts in 1942–1944 was that no coal, gas, oil, or other mineral deposits existed under the condemned properties that would support exploration or operations at the time of sale. *See* Gov't Pre–Trial Mem. at 41 ("There is no evidence (and plaintiffs do not even contend that there is) that the government knew something about the [coal, oil, gas, or other] minerals that the landowners did not[.]"); [41] *see also* DX 183 (Direct Testi-

40. *See, e.g.,* CX 270 (Sept. 21, 2004 John E. Johnson Dep.) at 93 ("They weren't offered their land back that they owned originally. . . . They thought they were going to be the ones to be offered the land back. But the government broke it up into tracts of 800,000 [sic] acres or something like that. And my dad certainly wasn't interested in anything like that."); CX 272 (July 13, 1995 William Logan Newman Dep.) at 34 (Newman recalled attending an auction in 1965 of the land "in great big tracts . . . It was as high as 1,500 acres in one tract."); *see also* CX 276 (July 14, 1995 Mrs. William Walter (Kathryn) Pullum Dep.) at 55–56 (learned about auction of land in newspaper); CX 273 (July 14, 1995 Mrs. Thomas Raymond (Lottie May) Lynn Dep.) at 10, 77 ("And they put it up in big quantities of acres and sold it to the highest

bidder."); CX 274 (July 14, 1995 William B. Caton Dep.) at 23–24 ("If I'd had got the land that I owned, 50 acres, I'd had to bought 900 acres . . . it was in a tract that sold, one tract, 900 acres.").

41. *See, e.g.,* CX 271 (Oct. 1, 2004 Heady Dep.) at 60 (testifying that there were no oil or minerals development on the land at the time it was acquired for Camp Breckinridge); DX 182 (Direct Testimony of Government's expert Dr. Johnson) at DOJ1853–54 (reporting that Ashland Oil drilled a well in May 1943 on the C.T. Newman farm 2.5 miles west of Morganfield, that produced 102 barrels per day, a well was drilled on the Russelburg Farm in Hitesville 3 miles north of Waverly producing 30 barrels per hour, and Henderson County produced 356,085 barrels in

mony of Government's Expert Dr. Jay L. Brigham) at 15 (reporting that "geologists [in 1942–1943] were studying the region's oil resources, although actual drilling and production were minimal."); *id.* at 13–14 (reporting that in Willard Rouse Jillson, *The Geology of Union County* (1943), the existence of eight well-defined oil pools located on a map of Union County was noted, but none were within the boundaries of Camp Breckinridge, although seven "dry holes" were identified); *see also id.* at 14 (the Kentucky Oil and Gas Association 1942 Report described that: four wells in Webster County produced a total of 7,075 barrels annually or an average of 4.8 barrels a day; 176 wells in Henderson County produced 358,408 barrels annually or an average 5.5 barrels per day);[42] DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) (Record of Tract E–489, GSA Records, Chicago–FRC); *see also id.* (Ex. 82) (April 26, 1965 UNION COUNTY ADVOCATE reporting "At the time (1941–1943) there had been little or no exploration of what was under the surface of the ground[.]").[43]

The purchase options issued by the Government further evidence this "basic assumption" since they specifically excluded "all oil and gas leases of record that are still in force, also except all coal and mineral rights heretofore conveyed if any." *See* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) at DOJ3132. In addition, the Government required two negotiators from the Department of Real Estate to attest on the Certificate of Inspection and Possession for each condemned property that:

> January 1943, but characterizing the production as "minuscule compared with the gushers of Texas and Oklahoma[.]").

**42.** *See* DX 183 (Ex. 15) at DOJ3006–07 (Kentucky Oil and Gas Association, *A Report on The Conditions of the Oil Industry in the State of Kentucky* (1942) at 10–11 submitted to Harold Ickes, Petroleum Coordinator for National Defense, and Leon Henderson, Administrator, Office of Price Administration).

**43.** The Government has argued that "Modern Allegations are not Supported by the Historical Record." *See* Gov't Post–Trial Brief at 35–64. On one hand, the Government asserts that "his-

to the best of my information and belief after diligent inquiry and physical inspection of said premises there is no evidence whatever of any ... exploration or operations whatever for the development of coal, oil, gas or other minerals on said lands[.]

DX 541 at CHI–002–A015–0015 (cited in Gov't Pre–Trial Mem. at 14); *see also* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 46) (Record of Tract E–489, GSA Records, Chicago–FRD).

The Government also required the landowners to execute an Affidavit of Vendor that included the following, or substantially similar, language representing:

> That there are no explorations or rentals being paid whatever for the development of coal, oil, gas or other minerals on said lands, that there are no outstanding rights under the terms of any oil, gas, coal or other mineral leases appearing of record for the reason that no rentals under any oil, gas or mineral leases have been paid to those vendors within the past 9 months, nor to any predecessor in title within the past 10 years; that no oil, gas or mineral well was drilled on said premises as provided by the terms of said leases; that oil, gas or mineral leases are void, and all rights thereunder forfeited for the reason of non-performance on the part of the lessee or his (their) assigns to pay rental, or drill wells according to the terms of said leases, that no exploration for oil, gas or minerals are being conducted on said premises at this time, and that there are no oil wells on said premises.

*See, e.g.,* DX 541 at CHI–002–A015–0036 (emphasis omitted) (cited in Gov't Pre–Trial Mem. at 14).[44]

toric newspaper articles" do not support claimants' allegations. *Id.* at 31–47. Yet, the Government's expert witnesses cite and rely extensively on "historic newspaper articles" to support their testimony and opinion. *See* DX 182 (Direct Testimony of Dr. Johnson) at 66 source notes 3, 17, 20–30, 32–72, 74–84, 87–99, 101, 104, 107, 113, 117, 122, 124–29; *see also* DX 183 (Direct Testimony of Dr. Brigham at Ex. 21, 22, 23, 25–34, 36–38).

**44.** *See, e.g.,* CX 126 (March 29, 1979 T.J. Tapp Aff.: "The first and last check he received from this oil well was $120.00 ... the government had no need for the oil well during the war."); CX

133 (March 1, 1979 James L. Wathen Aff. indicating no pumping oil wells were on the property in 1942); CX 147 (Feb. 15, 1979 Ruth G. Henshaw Aff.: "No consideration was given [to grandparents] for their mineral rights."); CX 149 (Feb. 15, 1979 Benny Griggs Aff. indicating no pumping oil wells were on property of J.M. Griggs in 1942); CX 151 (March 12, 1979 T.C. Griggs Aff. indicating that no pumping oil wells were on the property of Curtis Griggs in 1942); CX 153 (March 27, 1979 Russell Babbs Aff. indicating that no pumping oil wells were on property of Otho and Fannie Babb in 1942); CX 155 (Aug. 17, 1979 Russell H. Holeman Aff. indicating no pumping oil wells were on the property of Russell J. Holeman in 1942); CX 157 (Feb. 16, 1979 Edna Lynn Aff. indicating no pumping oil wells were on property of Edna V. Lynn and Jim Lynn in 1942, but had leased oil for 25¢ an acre .... "[t]he [Government] man who came to talk to us said they did not want to pay for the oil and mineral rights as they did not [need] that to train the soldiers. So we got no money for the oil and gas."); CX 163 (March 15, 1979 Donald L. Bullock Aff. indicating that there were no pumping oil wells on property in 1942); CX 167 (Sept. 21, 1978 Clifton E. Blue Aff.: "We were told we would get the mineral rights back also, the government had no use for the minerals."); CX 168 (March 15, 1979 Ruth S. Russell Aff. indicating that there were no pumping oil wells on the property in 1942 and "there never was a price put on the oil and gas lease."); CX 169 (Feb. 16, 1979 Jessie Russell Wood Aff. indicating that there were no pumping oil wells on the property in 1942 and "the government took our oil and mineral rights and didn't pay us a penny."); CX 170 (March 9, 1982 Elvis Stone Aff. indicating that there were no pumping oil wells on the property in 1942); CX 172 (March 15, 1979 Stanley Nelson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 173 (Feb. 16, 1979 Hassie Tilley Adamson Aff. indicating that there were no pumping oil wells on the property in 1942 and the "government took our mineral rights and didn't pay us a cent for it."); CX 178 (May 21, 1979 Lillie White Riggs Freer indicating that there were no pumping oil wells on the property in 1942); CX 180 (March 13, 1979 Mr. and Mrs. Puryear Aff. indicating that there were no pumping oil wells on their property in 1942. Although in 1979 "No–1 Coal Mine is mining under my farm for several years, and I have abundance of coal."); CX 182 (Feb. 6, 1979 Mrs. Joe (Caroline) Greenwell Aff. indicating that there were no pumping oil wells on the property in 1942); CX 183 (Feb. 13, 1979 Robert G. Greenwell Aff. indicating that there were no pumping oil wells on the property in 1942); CX 185 (Feb. 13, 1979 Mary Lou Spencer Caton Aff. indicating that there were no pumping oil wells on the property in 1942); CX 190 (March 2, 1979 A.J. Gibson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 196 (March 15, 1979 Vendaline Nelson Aff. indicating that there were no pumping oil wells on the property in 1942); CX 197 (March 6, 1979 Jewell Duncan Aff. indicating that there were no pumping oil wells on the property in 1942); CX 198 (May 19, 1979 W.W. Pullum Aff. indicating that there were no pumping oil wells on the property in 1942, but there had been a "test oil well drilled on our property just shortly before the government took over. We had our farm leased for [oil] five years at $1.00 ... an acre."); CX 206 (May 21, 1979 Prudy Oglesby Aff. indicating that there were no pumping oil wells on the property in 1942); CX 210 (Feb. 12, 1979 Billy J. Timmons Aff. indicating that there were no pumping oil wells on the property in 1942 and ... "They paid us nothing for mineral rights which they sold after the land was declared surplus."); CX 211 (Oct. 20, 1978 G.W. Cambron Aff.: "The oil rights underlying the affiants' father's property had been leased to an oil company at the time it was taken. The affiant's father asked, in the affiant's presence, if the government would allow him to retain the mineral rights. He was informed by t@he government agent that 'we will have to have this land from heaven to hell.' "); CX 212 (Feb. 6, 1979 Anne Luckett Cambron Sanley Aff. indicating that there were no pumping oil wells on the property in 1942); CX 213 (March 16, 1979 Elizabeth J. Stegar Aff.: "No consideration was given them for their mineral rights[.]"); CX 216 (Nov. 16, 1979 Samuel W. Steger Aff. indicating that there were no pumping oil wells on the property in 1942); CX 218 (May 21, 1979 Annie Miller (Day) Jenkins Aff. indicating there were no pumping oil wells on property in 1942 ... "The Oil Company was sizagraphing for oil at the time the rumors were about us having to move ...The oil co. would not talk to us after they found out the government might take the land."); CX 219 (March 7, 1979 Henry V. Clements, Jr. Aff.: "We were paid ... nothing for the oil and coal rights. This land had an oil lease on it at this time. The government took the amount of money that had been paid on the oil lease from the sale price of the land, and this amount of money was paid back to oil company."); CX 221 (Jan. 29, 1979 Charles Russell Aff. indicating there were no pumping oil wells on property in 1942); CX 223 (Feb. 2, 1979 Helburn Tapp Aff. indicating there were no pumping oil wells on property in 1942); CX 226 (May 21, 1979 Helen Whitledge Aff. indicating there were no pumping oil wells on property in 1942, however, "[a]s of this date [May 21, 1979] there are three oil wells pumping oil from this land now. They have been pumping for several years."); CX 227 (Feb. 5, 1979 Lorene Straker Aff. indicating there were no pumping oil wells on property in 1942); CX 228 (July 16, 1979 Odessa Duncan Watson Aff. indicating there were no pumping oil wells on the property in 1942); CX 230 (May 21, 1979 Jess Anderson Tapp Aff. indicating there were no pumping oil wells on property in 1942); CX 267 (April 4, 1979 Frederick Williams Aff.: a former federal appraiser at Camp Breckinridge stating that he "was instructed by his superiors not to consider any value for the minerals underlying the said property and in fact when the Affiant made his report of appraisal for the various tracts which he had appraised, he attributed no value to the

Where the Government was aware of even the potential for coal, gas, oil, or mineral deposits because of the existence of a lease, whether being exercised or not, the lessees were paid for the leases or negotiated an agreement whereby the lessees could resume activities after the war. *See* DX 627; DX 630; DX 633.

### b. The Parties' Mutual Mistake Had A Material Effect On The Agreed Exchange Of Performance.

The commentary to RESTATEMENT § 152 requires that plaintiff establish that there was "a material effect on the agreed exchange of performances [such that] the resulting imbalance in the agreed exchange is so severe that [Plaintiffs] cannot fairly be required to carry it out." RESTATEMENT § 152 cmt. c. "Ordinarily [Plaintiffs] will be able to do this by showing that the exchange is not only less desirable to [Plaintiffs] but is also more advantageous to the other party. Sometimes this is so because the adversely affected party will give, and the other party will receive, something more than they supposed.... In such cases the materiality of the effect on the agreed exchange will be determined by the overall impact on both parties." *Id.*

One of the most influential scholars in contract law and a RESTATEMENT Reporter advises that, "Case law supports [the RESTATEMENT'S] view that hardship for one party is a sufficient basis for avoidance for mistake." FARNSWORTH § 9.3 at 599. This record in this case evidences that the parties' mutual mistake that there were no coal, gas, oil, and other minerals under the condemned properties to support exploration or operation had a material effect on the agreed exchange of performances. In this case, material effect is evidenced by the difference between the $3,727,460 price paid

minerals underlying the property."); *see also* CX 270 (Sept. 21, 2004 John E. Johnson Depo.) at 34–35, 48 (Mr. Johnson testified that he was not aware of any oil wells on either his parents' or grandparents' land at the time the land was acquired by the government, but before Mr. Johnson's parents and grandparents were paid for their land almost two years after they moved, "there was bickering over the oil leases [with] Chester Oil Company ... involved in leasing at that time.... [His parents] were more concerned about the land than they were minerals. Of course, as it turned out, I think the minerals were worth a lot more than what the land is now."); CX 273 (Mrs. Thomas Raymond (Lottie May) Lynn Dep.) at 12 (The Government said the mineral rights "was of no value[.]"); *see also id.* at 17 ("Well, they told us the mineral rights was of no value."); *id.* at 23 ("Three thousand and eight hundred ... That was just for the land, not the oil and gas and stuff ... we didn't get no money for it and they didn't say nothing about taking it. They just told us it was no value."); CX 275 (July 14, 1995 Mrs. Spaulding (Mary Virginia) Dixon Dep.) at 11 (Government agents advised Mrs. Dixon and her husband that "all they were interested in was the land. We would reserve the coal and oil rights."); CX 276 (July 14, 1995 Mrs. William Walter (Katherine) Pullum Dep.) at 32–35 ("They [oil company] were digging what they called a test hole just a few days before we had to vacate. And they moved out in the middle of the night and, you know, didn't tell us anything. So we had no idea what they found."); *see also id.* at 33 (The lease amount was "a dollar an acre."); *but see* July 13, 1995 Eulah P. Tilley Dep. at 31–32 ("We supposed there were [minerals on our property]; the oil

were all around. They hadn't dug on us, but we presumed they were." At the time the land was acquired, the Tilleys had a mineral lease with Gulf Oil Company. Mrs. Tilley testified that, although they wanted to keep the minerals, "the man that represented the government ... said [the Tilleys] couldn't take the minerals from the land; they had to let the minerals go."); *see also* Aug. 13, 2004 Def. Exhibits In Support of Motion in Limine Tab 4 at 20 (May 30, 1979 James Springer Aff. indicating there was no pumping oil wells on property in 1942); *see also id.* at 40 (Feb. 15, 1979 Virginia G. Toombs Aff.: "No consideration was given [grandparents] for their mineral rights. Just the same old promise that they could buy their land back and [the Government] knew right then that it would never be done."); *but see id.* at 39 (Feb. 23, 1974 John J. Brooks, Jr. and Anne G. Brooks Aff. indicating that there were pumping oil wells on property in 1942).

*See, e.g.,* DX 680 (Answer to Interrogatory 9: "[M]y grandparents always said they were not compensated for the oil and mineral rights. They were puzzled why the government wanted the underground rights if the land was to be used for Army training."); DX 681 (Answer to Interrogatory No. 7: "Before this land grab the minerals coal and oil where [sic] untapped."); DX 695 (Answer to Interrogatory 7: "Prior to eviction none of minerals were on land or being extracted. Have heard since land was rich with minerals and coal."); DX 701 (Answer to Interrogatory 7: "There was no mineral or oils being removed at the time of eviction. After the war this land was turn[ed] into a coal mine until it was completely mined out of coal.").

for the land in 1942–1944, compared with: the 1957 Felmont Oil lease, which yielded the Government $705,069; the 1957 Kingwood Oil lease, which yielded the Government $1,126,696; the 1966 sale of coal, gas, oil, or other mineral rights, which yielded the Government $31,752,544, and the 1967 sale of coal rights on 3,923 acres, which yielded the Government an amount that has not yet been disclosed to the court, as well as any additional royalties paid by the transferee of the Felmont Oil and Kingwood Oil leases after April 30, 1964. There is no question that the financial benefit that the Government received from the coal, gas, oil, and other mineral interests far exceeded what was bargained for, *i.e.*, the use of the land for Camp Breckinridge, which was the sole basis of the Declarations of Taking. *See* JX 206A ("The public uses for which said lands are taken are as follows: The said lands are necessary adequately to provide for establishment of a triangular division camp. The said lands have been selected by me for acquisition by the United States for use in connection with the establishment of the Camp Breckinridge[.]"). Moreover, it is of significance that there is no mention in any of the Declarations of Taking that the Government was exercising eminent domain rights over potential coal, gas, oil, and other mineral interests. *See, e.g.*, JX 206A–D; JX 264A–J; JX 485A–B; JX 504A–C; JX 530D; JX 536A.

Therefore, S. 794, Section 2(2), has been satisfied by a preponderance of the evidence as the former landowners were paid less than reasonable value by the Government for the conveyance of their land in fee simple.

### c. The Parties' Mutual Mistake Should Not Be Born By The Former Landowners.

The RESTATEMENT requires that a party bears the risk of a mistake when: "(a) the risk is allocated to him by agreement of the parties, or (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." RESTATEMENT § 154 at 402–03. The RESTATEMENT also requires that the party adversely affected must not bear the risk of the mistake. *See* RESTATEMENT § 152 cmt. a.

Under the unique and *sui generis* circumstances of this case, the landowners should not bear the risk of the parties' mutual mistake that in 1942–1944 there were no coal, gas, oil, or other mineral deposits to support exploration or operation. First, the Government did not include any language in the Contracts requiring the landowners to assume such a risk. *See, e.g., Flippin Materials Co. v. United States*, 160 Ct.Cl. 357, 312 F.2d 408, 415–16 (1963) ("elaborate contract provisions ... together with the omission of the usual changed conditions clause, show that the risks of mistakes as to subsurface materials were deliberately placed" on the contractor). Second, the Government required the landowners to vacate the premises under very short notice. Therefore, even if a landowner may have wanted to seek a neutral professional assessment of the potential for coal, gas, oil, and other minerals on the property, the time and exigencies of war made that both impracticable and impossible. Under these circumstances, it would be unreasonable for the court to allocate the risk of the mistake to the former landowners.

For these reasons, the court has determined that the 1942–1944 contracts are void, because they were based on a mutual mistake. Although the First Amended Complaint did not set forth a separate claim for alleged mutual mistake, nevertheless, the requisite elements are set forth in ¶¶ 2–26, 145–153, 159–161, 170–174.[45] More importantly, the Government recognized in pretrial proceedings the importance of mutual mistake with regard to coal, gas, oil, and other minerals, *see* Feb. 20, 2004 Pre–Trial Conference TR at 30–36, 40–43 (reprinted *infra* at 691–92), and proffered much of the evidence relevant in this regard. Therefore,

---

45. The court *sua sponte* vacates the June 29, 1998 Order in this case insofar as it dismissed

¶ 171 of the First Amended Complaint.

there can be no question that the requirements of RCFC 15(b) [46] have been met. *See, e.g., Kirkland v. District of Columbia,* 70 F.3d 629, 633 (D.C.Cir.1995) (quoting CHARLES A. WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1493 at 19 (1990)) (" 'Consent generally is found when ... the party opposing the motion to amend actually produced evidence bearing on the new issue.' "); *Fejta v. GAF Companies,* 800 F.2d 1395, 1396 (5th Cir.1986) (holding that an issue was tried by implied consent where evidence was introduced without objection and the opposing party introduced evidence relevant to that issue).

Accordingly, Plaintiffs will be afforded 60 days within which to file a concise Second Amended Complaint to conform to the evidence and issues tried in this case, as specifically discussed herein. *See* CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 1493 (2005) ("When appropriate, the court may direct the amendment of the pleadings on its own.").

### 3. The Remedy For Mutual Mistake Is Restitution.

█ A "person who has been unjustly enriched at the expense of another is required to make restitution." RESTATEMENT OF RESTITUTION § 1; *see also* RESTATEMENT § 152(2) at 385 ("In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of ... restitution, or otherwise."). It is well settled that restitution is an available remedy for the Government's breach of contract with a private party. *See Mobil Oil Exploration and Producing Southeast, Inc. v. United States,* 530 U.S. 604, 623, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (Breyer, J.) (holding that company's urging of performance despite the government's repudiation of a contract did not constitute a waiver of the right to restitution); *Landmark Land Co., Inc. v. F.D.I.C.,* 256 F.3d 1365, 1372 (Fed.Cir.2001) ("Restitution is available to a private party to remedy a

contract breach or repudiation by the government."); *see also* GEORGE PALMER, LAW OF RESTITUTION Ch 10 (1978); Saul Levmore, *Explaining Restitution,* 71 VA. L. REV. 65 (1985) ("restitution offers an opportunity to inspect ... asymmetry between the law's treatment of harms and ... benefits.").

The purpose of restitution:

> is not the enforcement of a promise, but an entirely distinct goal-the prevention of unjust enrichment. The focus is on the party in breach rather than on the injured party, and the attempt is to put the party in breach back in the position in which that party would have been had the contract not been made. The party in breach is required to disgorge what that party has received in money.... The interest of the injured party that is measured in this way is called the *restitution interest.* It is ordinarily smaller than either the expectation interest or the reliance interest. Although recovery measured by either of those interests takes account of cost incurred in conferring a benefit on the party in breach, the restitution interest includes neither the injury party's lost profit nor the part of that party's expenditures in reliance that conferred no benefit on the party in breach.

FARNSWORTH § 12.1 at 154–55; *see also* Fuller and Perdue, *The Reliance Interest in Contract Damages* (pt. 1), 46 YALE L.J. 52, 54 (1936) (The restitution interest has "two elements: (1) reliance of the promisee, (2) a resultant gain to the promisor ... In some cases a defaulting promisor may after his breach be left with an unjust gain which was not taken from the promisee (a third party furnished the consideration), or which was not the result of reliance by the promisee[.]"). Therefore, when liability is based on unjust enrichment, "recovery is measured by the restitution interest.... The party in the wrong is required to disgorge the benefit it has received, putting that party back in the position in which it would have been had

---

**46.** RCFC 15(b) provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the

pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence ..., but failure so to amend does not affect the result of the trial of these issues."

there been no wrong[.]" FARNSWORTH § 3.26 at 387; *see also id.* § 12.2 at 156.

In this case, the former landowners relied on Government actions and statements, albeit made in mistake, that there were no coal, gas, oil, and other minerals under the condemned properties to support exploration or operation in 1942–1944. And, in this case, the record to date evidences that the Government was unjustly enriched by at least $32,879,240, not including any additional royalties received as a result of the 1957 and 1959 leases after April 30, 1964 or the 1967 sale of coal rights on 4,800 acres.

### 4. Application Of Asserted Defenses.

The Government has asserted the defenses of preclusion and statute of limitations. *See* Nov. 3, 1995 Answer to First Amended Complaint, Third and Fifth Defenses at 44.

#### a.) Preclusion Is Not Applicable In This Case.

 Under the doctrine of *res judicata,* when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, parties to the suit and their privies are bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. Sac County,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *see also Federated Dept. Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981); RESTATEMENT (SECOND) JUDGMENT § 24 (1982); *Ammex, Inc. v. U.S.,* 334 F.3d 1052, 1055 (Fed.Cir.2003) (*citing Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 n. 5 (1979); *Jet, Inc. v. Sewage Aeration Sys.,* 223 F.3d 1360, 1362 (Fed.Cir.2000)) ("To prevail on a claim of *res judicata,* the party asserting the bar must prove that (1) the parties are iden-

tical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first."). The Government cannot satisfy all three of these elements.

 Neither the final judgments entered by the United States District Court for the Western Division of Kentucky in any of the condemnation proceedings that were determined by a jury trial or settlement nor final judgments entered by the United States District Court for the Western District of Kentucky have preclusive effect on this case, because the facts on which a claim of mutual mistake did not occur until many years later.

 The decision of the United States Court of Appeals for the Sixth Circuit in *Higginson v. United States,* Civil Action No.2074 (W.D.Ky. Sept. 7, 1965) (unpublished), 384 F.2d 504 (6th Cir.1967), *cert. denied,* 390 U.S. 947, 88 S.Ct. 1034, 19 L.Ed.2d 1137 (1968) also does not have a preclusive effect on this case, because none of the Plaintiffs in this case were parties in *Higginson.* Mr. Cyrus P. Higginson was the only named plaintiff in the 1965 action, but he is not a plaintiff in this case.

First, Plaintiffs in this action also are not in privity with Mr. Cyrus P. Higginson. For parties to be in privity, the interests involved in the prior litigation must have been identical to those in this case, such that the Plaintiffs' interests in this case were "virtually represented" by Mr. Higginson. *See Media Technologies Licensing, LLC v. Upper Deck Co.,* 334 F.3d 1366, 1370 (Fed.Cir.2003). There was no express legal relationship between Mr. Higginson and Plaintiffs in this case.[47] There also was no implied legal relationship. There is no evidence in the record that other landowners urged Mr. Higginson to file his suit, participated in the selection of his counsel, reviewed the 1965 complaint,

---

47. Plaintiffs 419–26, listed in Plaintiffs' September 21, 1995 First Amended Complaint, all have Higginson as their sur-name. If any of these Plaintiffs is an heir to Cyrus P. Higginson, as a matter of law, they are precluded from participating in this case insofar as the Third Amended Complaint in *Higginson* alleges knowledge of the facts on which a claim could have been asserted under the doctrine of mutual mistake as to the

1965 sales of coal, gas, oil, and other mineral rights. *See* DX 64 (*Higginson* Third Compl.) at DOJ1184–1193. Preclusion, however, does not bar their claims, if any, arising from the 1967 sale of additional coal rights on 3,930 acres. *See* RESTATEMENT (SECOND) JUDGMENT § 24 cmt. a ("Claim in the context of *res judicata* has never been broader than the transaction to which it is related.").

contributed to paying Mr. Higginson's counsel or costs, or relied on Mr. Higginson to represent and protect their legal interests.

Second, *Higginson* was dismissed on jurisdictional grounds and did not proceed to "final judgment on the merits."

Third, this case is not based on all of the same transactional facts as *Higginson.* The RESTATEMENT (SECOND) JUDGMENTS § 24 defines " 'claim' as encompassing rights and remedies arising out of the same set of transactional facts. A common set of transactional facts is to be identified 'pragmatically.' " *Id.* "Courts have defined 'transaction' in terms of a 'core of operative facts,' the 'same operative facts,' or the 'same nucleus of operative facts,' and 'based on the same, or nearly the same factual allegations.' " *See Parsons Steel, Inc. v. First Ala. Bank,* 474 U.S. 518, 521, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); *Nevada v. United States,* 463 U.S. 110, 129–30, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (requiring courts to first determine whether the "same cause of action" is being sued upon). One of the tests for determining whether or not the causes of action should have been joined in one suit is "whether the evidence necessary to prove one cause of action would establish the other." *United States v. Haytian Republic,* 154 U.S. 118, 125, 14 S.Ct. 992, 38 L.Ed. 930 (1894).

Mutual mistake regarding whatever additional revenues the Government received after the Felmont Oil lease was conveyed to another company on May 1, 1961 and after the Kingwood Oil lease was conveyed to another company on October 1, 1977 could not have been adjudicated in *Higginson.* Likewise, *Higginson* does not preclude Plaintiffs from seeking an adjudication of the claim arising from the 1967 sale of coal rights on an additional 3,930 acres.

### b.) Statute of Limitations Is Applicable In This Case.

Statute of limitations serve the interests of all parties in litigation and the public interest by specifying a time certain by which a defendant is:

relieved of the obligation to defend against claims for which necessary evidence may no longer be available, memories have faded, or important witnesses may have disappeared. Stale claims and unfair surprise are alleviated and the defendant is given notice of adverse claims. In the absence of such statutes, the defendants could find themselves at the mercy of unscrupulous plaintiffs who hoard evidence that supports their position while waiting for their prospective opponents to discard evidence that would help make defense.

The plaintiff is induced not to neglect valid claims. When no attempt is made in a reasonable time to enforce a demand, it is likely that a judicial presumption will arise against the original validity of the claim or its continued existence. Courts have reinforced their support of these general principles by holding that any existing doubt be resolved in favor of the operation of the statute of limitations and that exceptions to the statute be strictly construed.

CORMAN ON LIMITATIONS § 1.1 at 11–14.

As the United States Court of Appeals for the Seventh Circuit stated in *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446 (7th Cir.1990) (Posner, J.),[48] "Statutes of limitations are not arbitrary obstacles to vindication of just claims, and therefore they should not be given grudging application. They protect important social interests in certainty, accuracy, and repose.... We should not trivialize the statute of limitations by promiscuous application of tolling doctrines." *Id.* at 452–53.

The Government has argued that Plaintiffs "failed to provide a persuasive explanation for why they made no attempt to pursue their claim between the end of World War II and the auction of the Breckinridge properties beginning in 1965." Gov't Post–Trial Memo at 121. The United States Court of Appeals for the Federal Circuit recognizes that a claim first accrues only when all of the events have occurred which fix the alleged liability of the Government or entitle the plaintiff to file suit. Therefore, the relevant

---

**48.** Judge Posner is currently the Chief Judge of the United States Court of Appeals for the Seventh Circuit.

question is when did the former landowners' right of action to void the 1942–1944 Contracts for mutual mistake first accrue?

The record establishes that the former landowners' claim arising from the DOI's leases to Felmont Oil Corporation and Kingwood Oil Co. accrued on or about May 1, 1957 and December 1, 1959, respectively. *See* DX 72; DX 73; DX 74. In addition, the record establishes that the former landowners' claim arising from the April 15, 1966 sales of coal, gas, oil, and other minerals accrued on or about that date. *See* DX 48; DX 54; DX 83; DX 84; Pl.Ex. 244. In addition, the record establishes that the former landowners' claim arising from the 1967 coal sale accrued on or about September 29, 1967. *See* Court Ex. 3A; Court Ex. 3I. Therefore, since the Complaint in this case was not filed until January 12, 1994, the six-year statute of limitations set forth in the Tucker Act, 28 U.S.C. § 2401(a) will bar the former landowners a remedy, unless the record justifies the court's invocation of the doctrine of equitable tolling to suspend the statute of limitations.

### c.) Under The Circumstances Of This Case, The Doctrine Of Equitable Tolling Stays The Statute Of Limitations.

Chief Judge Posner's succinct primer on equitable tolling in *Cada* is both instructive and relevant to this case:

Tolling doctrines stop the statute of limitations from running even if the accrual date has passed. Two tolling doctrines might be pertinent here (others include the plaintiff's incapacity ...). One, a general equity principle not limited to the statute of limitations context, is equitable estoppel, which comes into play if the defendant takes active steps to prevent the plaintiff from suing in time ... Equitable estoppel

in the limitations setting is sometimes called fraudulent concealment[.]

*Id.* at 450–51 (citations omitted).

Although there is evidence in this record indicating that the Government at various times provided information that was dissembly, misleading, or incomplete, the court has determined this conduct does not rise to fraudulent concealment.[49]

█ Chief Judge Posner further discusses that the doctrine of *equitable tolling:*

permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence [plaintiff] is unable to obtain vital information bearing on the existence of [plaintiff's] claim. Equitable tolling is frequently confused both with fraudulent concealment on the one hand and with the discovery rule—governing, as we have seen, accrual—on the other. It differs from the former in that it does not assume a wrongful—or any—effort by the defendant to prevent the plaintiff from suing. It differs from the latter in that the *plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant.*

*Id.* at 451 (emphasis added); *see also Wheeldon v. Monon Corp.,* 946 F.2d 533 (7th Cir. 1991) ("equitable tolling 'permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.' Equitable tolling 'often focuses on the plaintiff's excusable ignorance of the limitations period and on the lack of prejudice to the defendant.'") *Id.* at 536 (citations omitted).[50]

---

49. *See, e.g.,* Court Ex. 4A (Nov. 9, 1978 letters from Roy Markon, Commissioner, GSA, to Mr. Louis D. Roberts, Mr. Albert A. Martin, and Mark A. and Eleanor Martin stating the "disposal of Camp Breckinridge was in accordance with existing laws and regulations and has withstood judicial review. For this reason, we do not contemplate an investigation."). What the GSA Commissioner stated was true; what the GSA Commissioner did not state, nor was he required

to do so, was that the *Higginson* case improperly asserted jurisdiction under the Surplus Property Act of 1944, law that expired 21 years prior to the filing of the Complaint, and therefore discovery was never taken and the merits never considered.

50. Chief Judge Posner also was a member of the panel that decided this case.

Before examining the elements of excusable ignorance and prejudice, a brief discussion about the applicability of the doctrine of equitable tolling to cases involving the Government is in order.

###### i. The Tucker Act Does Not Prohibit The Application Of The Equitable Tolling Doctrine Nor Is It Inconsistent With Legislative Intent.

■ In a unanimous opinion, *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the United States Supreme Court held in a case between private litigants that "the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose." *Id.* at 559, 94 S.Ct. 756.

Subsequently, in *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the United States Supreme Court, in an opinion delivered by Chief Justice Rehnquist, determined that "a more general rule [should] govern the applicability of equitable tolling in suits against the Government." *Id.* at 95, 111 S.Ct. 453. Therefore, as a matter of law, where Congress has waived sovereign immunity, the United States Supreme Court has held that the "same rebuttal presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the Government." *Id.* at 95–96, 111 S.Ct. 453; *see also United States v. Brockamp*, 519 U.S. 347, 350, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) (allowing the Government to rebut the presumption of equitable tolling). *See Brice v. Secretary of Health and Human Services*, 240 F.3d 1367 (Fed.Cir.2001) (holding that equitable tolling should not apply where "the relevant limitations statute manifested congressional intent to preclude tolling," as in *Brockamp*).

Significantly, the United States Supreme Court in *Irwin* invited "Congress ... [to] provide otherwise if it wishes to do so." *Irwin*, 498 U.S. at 96, 111 S.Ct. 453. Congress has amended the Tucker Act on 13 occasions since its enactment. On no occasion has Congress directed that the doctrine of equitable tolling should not be considered in suits against the Government.[51]

In addition, a breach of contract action brought under the Tucker Act is sufficiently similar to a similar private cause of action that consideration of the doctrine of equitable tolling is appropriate and necessary, particularly where "harsh and unjust results" may occur if the statute is not tolled. In this case, as in *Bailey v. West*, 160 F.3d 1360, 1362–68 (Fed.Cir.1998) (*en banc*) (affirming equitable tolling of time limits for appealing a Board of Veterans' Appeals to the Court of Veterans' Appeals), there is no statutory language or legislative history indicating that Congress intended to prohibit the applicability of the doctrine of equitable estoppel.

Moreover, in this case, there is no reason to assume that the relief requested would impose any undue administrative burden on the Government. *See Brice*, 240 F.3d at 1371. Maps in the record show both the condemned properties and the tracts of coal, gas, oil, and other mineral rights that were leased or sold. Evidence in the record also reports the amounts of money that the Government received for the 1957 and 1959 gas and oil leases and the 1965 sale of coal, gas, oil, and other mineral rights. The court has requested and expects to receive the amount of any additional royalties received on the 1957 and 1959 gas and oil leases and the amount received from the 1967 sale of coal rights on an additional 3,930 acres. From this information, an amount paid per acre can be determined and matched against the acre-

---

**51.** The Tucker Act has been amended 13 times since enactment in 1887 and Congress has never expressed any intention to bar application of the equitable tolling doctrine against the Government. *See, e.g.,* Jun. 27, 1898, 30 Stat. 494; Jul. 1, 1898, 30 Stat. 649; Mar. 3, 1911, 36 Stat. 1136; Jun. 10, 1921, 42 Stat. 24; Jun. 25, 1948,

62 Stat. 940; Jul 28, 1953, 67 Stat. 226; Sep. 3, 1954, 68 Stat. 1241; Jul. 23, 1970, 84 Stat. 449; Aug. 29, 1972, 86 Stat. 652; Nov. 1, 1978, 92 Stat. 2391; Oct. 10, 1980, 94 Stat. 1743; Oct. 29, 1992, 106 Stat. 4516; Oct. 19, 1996, 110 Stat. 3874.

age of the condemned properties, which then can be attributed to the appropriate Plaintiff.

The court has determined that under the unique and *sui generis* circumstances of this case the doctrine of equitable tolling stays the statute of limitations "where the interests of justice require vindication of the plaintiff's rights." *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965).

### ii. Excusable Ignorance.

■■■ Proof of a "mutual ... mistake of fact that is not caused by neglect of a legal duty will serve as a basis for tolling the running of a limitations statute.... Where mutual mistake is alleged in an attempt to toll the statute, proof of the exercise of *reasonable diligence* is required. The appropriate test for time of accrual is the date when the party alleging the mistake gains knowledge of facts that should have placed that party on inquiry. Reasonable diligence demands that the parties be receptive to actual or constructive notice that would uncover a mistake." CORMAN ON LIMITATIONS § 8.3 at 8–10 (emphasis added) (citing *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986)) ("Reservation of mineral rights has been omitted from deed by mutual mistake. Vendor's cause of action against purchasers for reformation and deed and for interest in mineral royalties did not accrue, and statute of limitations did not commence, until discovery of the mistake.")

Although ignorance of a cause of action does not toll the statute of limitations where the plaintiff has a duty of diligence, *i.e.*, "it is not enough that he did not discover *he* had a cause of action, if a reasonable man in his shoes would have." *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983) (Posner, J.) (emphasis in original) (citing *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127 (6th Cir.1982)) ("An injured party has a positive duty to use diligence in discovering his cause of action within the limitations period. Any fact that should excite his suspicion is the same as actual knowledge of his entire claim."). The record evidences that numerous requests/petitions were made by the former landowners to repurchase their land after World War II ended.[52] The record also evidences that there was considerable confusion about what federal office was responsible for decisions about disposal of Camp Breckinridge that was caused by the Government.[53]

---

52. *See, e.g.*, DX 95 (Jan. 29, 1946 reporting that Reginald Riggs of Morganfield, Kentucky was "interested in property for cultivation in the area of this camp."); DX 96 at DOJ1367 (Feb. 13, 1946 letter from Edward C. Espy, Waverly, Kentucky, to Congressman Louis Ludlow: "I am writing for information about the disposal of the land of Camp Breckinridge, Kentucky. The reason ... is that I am interested in starting to farm for myself."). The Government's standard response was that the "property has not as yet been declared surplus." DX 87 (July 20, 1944 letter from Chief of Surplus War Real Estate Division to William Wolflin of Berwyn, Illinois); *see also* DX 92 at DOJ1361 (Dec. 11, 1944 letter from Chief of Surplus War Real Estate Division to E.R. McBride of Paducah, Kentucky stating "[u]p to the present time, Camp Breckinridge has not been declared surplus to the needs of the government"); DX 94 (July 12, 1945 letter to Miss Dorothy Denton of Owensboro, Kentucky from Acting Deputy Administrator, Real Estate, Surplus Property Board stating that: "to date no portion of Camp Breckinridge has been reported to the Board."); DX 97 (March 5, 1946 letter from Special Assistant to Assistant Administrator, Real Property to Clayton Lynch, Evansville, Indiana ("Our records indicate that Camp Breckinridge ... [has] not yet been declared surplus.")); DX 102 at DOJ1375 (Aug. 1, 1946 letter from Associate Regional Director, War Assets Corp., to James T. Wright, Tolu, Kentucky ("In checking with our Real Estate Division, I am informed that the land as yet has not been declared to us.")); DX 107 (Dec. 2, 1946 letter from Deputy Regional Director, Office of Real Property Disposal, to Claude Randolph, Morganfield, Kentucky ("Camp Breckinridge has not been declared surplus to this agency, and we cannot give you the information requested at this time.")).

53. *See, e.g.*, DX 87 at DOJ1353 (July 20, 1944 letter from Chief, Surplus Real Estate Division, "We suggest that you contact Mr. B.A. Mattingly, the Manager" of the "Chicago Loan Agency of this Corporation, 208 South LaSalle Street, Chicago, Illinois."); DX 92 at DOJ1361 (Dec. 11, 1944 letter from Chief of Surplus War Real Estate Division to E.R. McBride of Paducah, Kentucky ("At such time as [Camp Breckinridge] is certified to this agency and available for disposition, we will be glad to communicate with you further in the matter.")); DX 97 (March 4, 1946 letter from Joseph J. Woolfson, Special Assistant, to Assistant Administrator, Clayton A. Lynch, Evansville, Indiana: "We are referring a copy of this letter to the Assistant Administrator, Real Property, in order that your name may be forwarded to the disposal agency charged with the

The record evidences no public notice or local news article about the 1957 lease to Felmont Oil or 1959 lease to Kingwood Oil at the time they were entered. In fact, it appears that Dr. W.H. Puryear and Judge A.G. Pritchett only became aware of the Government's plans to lease gas and oil underlying land they previously owned because Judge Pritchett had a lease on the land for "agricultural and grazing purposes." DX 73 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) at DOJ3442. The record evidences that two former landowners promptly sent a letter of protest to DOI to "protect our rights in property." DX 158 at DOJ1527. And, the record evidences that without notice of a hearing or the opportunity to present evidence, DOI issued a "Decision," summarily dismissing the "protest" without even minimum due process. Since DOI appears to have had legal authority to enter into protective leases, any appeal or collateral attack by the former landowners would have been unsuccessful at that time. It is important to recognize, however, that in 1957–1959 that these former landowners did not know whether and how much coal, gas, oil, and other minerals may have been located under their former lands, a predicate fact to allege mutual mistake. It was not until an article appeared in the UNION COUNTY ADVOCATE on April 30, 1964 about the financial benefits the Government received from gas and oil leases with Felmont Oil and Kingwood Oil, that some of the facts of mutu-

al mistake could have been ascertained—twenty-two years after the former landowners' property was condemned. *See* DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 72, 73); *see also id.* at (Ex. 80) at DOJ3569; JX 54 at DOJ1552. This information, together with a January 7, 1965 article reporting that GSA intended to auction off additional gas and oil rights, as well as coal and other mineral rights on April 15, 1965 (DX 183 (Direct Testimony of Government's Expert Dr. Jay L. Brigham) (Ex. 80) at DOJ3569 (Jan. 7, 1965 UNION COUNTY ADVOCATE)) provided sufficient information at least to support the unartful claim in the April 15, 1965 *Higginson* complaint that: "said attempt to dispose of said land as contemplated is arbitrary, capricious ... in regard to mines and mineral rights were not taken into consideration by the General Services Administration in attempting to sell all of the mineral rights in and under said land except as alleged herein, would be depriving the former landowners, heirs, successors, and assigns of their vested interest in and to said land[.]" DX 64 at DOJ1082.

Although the *Higginson* suit was never certified as a class action and was dismissed on jurisdictional grounds, the United States Supreme Court specifically has "allowed equitable tolling in situations where the claimant has actively pursued ... judicial remedies by filing a defective pleading during the statutory period[.]" *Irwin*, 498 U.S. at 96, 111

---

disposition of these installations when assigned for disposal."); DX 102 at DOJ1375 (letter from Orville Lamb, Associate Regional Director of War Assets Corporation: "A copy of this letter is being forwarded to Mr. John A. Moore, Manager, Federal Land Bank, 224 East Broadway, Louisville, Kentucky, so that when the land becomes available for sale, your name will be in his files. I might also add that at the time the land is available, a representative of the Federal Land Bank will be stationed on the grounds to receive offers."); DX 102 at DOJ1376 (response from Assistant Administrator, Real Property, War Assets Corporation to Congressman Louis Ludlow re: February 13, 1946 letter from Edward C. Espy, Waverly, Kentucky stating that "A copy of Mr. Espy's communication will be retained in the files of this office, and upon receipt of a surplus declaration and the assignment of the property to an agency designated for disposal, his interest will be conveyed with the request that he be immediately contacted and advised of the proce-

dure and course of action he should follow. The Post Commander at Camp Breckinridge is authorized to negotiate a revocable lease or grant a permit for agricultural purposes, if he deems it advisable. It is recommended that, pending a declaration of surplus, Mr. Espy contact the Post Commander[.]"); DX 107 at DOJ1385 (Dec. 2, 1946 letter from Deputy Regional Director, Office of Real Property Disposal, to Claude Randolph: "[W]e shall be glad to hold your letter in our files so that when the property has been declared surplus, full information will be forwarded to you."); DX 150 (July 5, 1951 letter to Fred I. King, Indianapolis, Indiana from Chief, Disposal Branch, Real Property Disposal Division: "Since the property remains under the jurisdiction of the Department of the Army, it is suggested that you communicate [interest in purchasing parcels No. 10, 246, and 248 in Tracts No. E–20, E–374 and E–380 respectively to] District Engineer, Corps of Engineers ... Louisville, Kentucky[.]").

S.Ct. 453. Landowners living in the Henderson, Union, and Webster County areas may have assumed, albeit erroneously, that sufficient efforts were made to preserve their legal rights to benefit from the doctrine of equitable tolling by the filing of the *Higginson* complaint. As for those former landowners who moved out of the area or did not know about the *Higginson* litigation, they would not have had any reason to know about the circumstances surrounding the 1957 and 1959 gas and oil leases, the 1965 auction of coal, gas, oil, and other mineral rights— or the 1967 auction of coal rights. Therefore, as Chief Judge Posner recognized, where the "injured party would have no reason to suspect he was the victim . . . ,

there may be no duty of inquiry at all." *Taylor*, 712 F.2d at 1118. *See, e.g.*, CX 272 (July 13, 1995 William Logan Newman Dep.) at 34 (Newman testified that he was unaware of the *Higginson* suit.).

One additional important point needs to be made. The Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA") was not enacted until 1966. Therefore, Plaintiffs did not have the ability to compel the Government to obtain and release information about the 1957 and 1959 leases and 1965 sales, and it is likely that any request for such information would have been denied or been nonproductive, as proved to be the case when KRC issued a series of FOIA requests in the late 1970's.[54] *See also* Aug. 13, 2004 Def.

---

**54.** On October 18, 1978, the KR Coalition received a response to a September 19, 1978 FOIA request from James J. Buckley, Acting Assistant Commissioner, Office of Real Property, Federal Property Resources Services, indicating that at GSA's Washington Office there was a "voluminous amount of files relating to the dispositions and acquisitions of Camp Breckinridge," but they could be viewed in Washington, D.C. DX 173.

On November 28, 1978, Congressman Carroll Hubbard sent a letter requesting "copies of any and all correspondence and documents of the General Services Administration relating to the disposition of acquisitions of Camp Breckinridge, Kentucky." The Congressman was advised on November 29, 1978 that the files were "voluminous" but could be inspected at GSA's Office of Real Property in Washington, D.C. *See* Court Ex. 3A (Nov. 29, 1978 letter from Paul E. Goulding, Deputy Administrator to Congressman Hubbard.).

Sometime in November 1978, Kevin Murphy, a staff member of the Kentucky Rivers Coalition spent a week reviewing documents relating to Camp Breckinridge at the Baltimore District Corps of Engineers, made available as a result of an October 18, 1978 Freedom of Information Act ("FOIA") request. *See* CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 28–30; Murphy Ex. 6 (Nov. 1, 1978 letter from Howard A. Pollack, Acting District Counsel, Baltimore District Army Corps of Engineers). Murphy did not recall finding a "smoking gun" that would support the landowners' contentions that the Government promised the landowners that they could repurchase their land after World War II. *See* CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 31–32; Murphy Ex. 7 (Dec. 19, 1978 letter to Judge A.G. Pritchett reporting "there was nothing in these federal court documents upon which to build a misrepresentation argument."); Murphy Ex. 8 (Dec. 21, 1978 letter to Judge A.G. Pritchett reporting that the federal court documents "do not attest to the landowners being assured to

have first option to buy the land back . . . the government seems to have so far refrained from making such commitments on paper."). As Mr. Murphy testified, however, that "in retrospect, I didn't think you would have found it." *See* CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 35.

On January 25, 1979, Murphy sent a letter to Howard A. Pollack, Acting District Counsel of the Baltimore District Corps of Engineers, reporting that he was informed by Mr. Early, Assistant Chief of Real Estate that "all records and documents dealing with negotiations in acquiring properties for Camp Breckinridge have long since been discarded." Murphy Ex. 10.

On March 8, 1979, Murphy sent a FOIA request to the Chief of Engineers of the Corps of Engineers attempting to locate and examine any documents about Camp Breckinridge. *See* Murphy Ex. 13; *see also* CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 55–58. In response, on March 27, 1979, the Acting Chief of the Programs Division of the Director of Real Estate indicated that any documents concerning Camp Breckinridge were forwarded to their General Services Administration Region 5 in Chicago. *See* Murphy Ex. 14; *see also* CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 59–61. On April 3, 1979, Murphy sent a follow up FOIA request to GSA Region 5. *See* DX 176. Murphy did not recall receiving a response or even visiting Chicago. CX 267 (Nov. 12, 2004 Kevin Murphy Dep.) at 61–62.

On April 11, 1979, Daniel K. Connolly, Director, Real Property Division, Federal Property Resources Service, advised Murphy that the Property Division disposed some of the records requested "some years ago," but 12–15 large boxes of files were now in the Atlanta office. *See* DX 177. The GSA offices in Washington had "correspondence, reports, sales data and conveyances pertinent to the disposal." *Id.* The "acquisition documents," however, would have to be "researched locally in the respective counties where they were recorded." *Id.*

Exhibits in Support of Motion in Limine Tab 4 at 48 (Jan. 9, 1979 letter from Heirs of Otho John Babb and Fannie Margaret Babb "seeking information on Mineral Rights on Tract # 72," evidencing that as of date of letter these heirs did not have sufficient information to file a claim arising from the disposition of mineral rights).

For these reasons and under the unique and *sui generis* circumstances of this case, the court has determined that Plaintiffs' ignorance of the underlying facts concerning their cause of action arising from mutual mistake regarding coal, gas, oil, and other mineral rights was excusable.

### iii. The Government Is Not Prejudiced By The Application Of The Equitable Tolling Doctrine.

In this case, the Government cannot establish that the delay in filing of the Complaint until January 12, 1994 caused the Government any specific prejudice, *i.e.,* causing the Government to change "position in a manner which would not have occurred had the plaintiff not delayed." CORMAN ON LIMITATIONS § 3.3.2. at 186–87. What happened between DOI's issuance of gas and oil leases, GSA's 1965–1967 sale of coal, gas, oil, and other mineral interests, GSA's 1967 sale of coal rights, and Plaintiffs' January 12, 1994 filing of a Complaint in the United States Court of Federal Claims is relevant to "how the delay affects [the Government] and the overall fairness in permitting the assertion of the claim." CORMAN ON LIMITATIONS § 3.3.2 at 183–84.

It was the Government that benefitted from the deaths of most of the original landowners and aging of their heirs. And, it was the Government that benefitted from the destruction of documents through agency retention programs.[55] For example, on June

22, 1994, GSA issued "Records Maintenance and Disposition System" that detailed schedules for "authorized disposition" of agency records, including those concerning appraisals and real property. *See* DX at DOJ0582–83; *see also* Court Ex. 2 (May 25, 2004 Table prepared by GSA showing that it disposed of records potentially relevant to this case in 1975, 1977, 1979, 1980, 1983, 1990, and 1995). Moreover, since the Government received Plaintiffs' May 14, 1994 Document Request before the GSA document retention policy was announced On June 22, 1994 and any 1995 "authorized disposition" took place, the Government may not rely on the June 22, 1994 GSA Policy as an excuse for not fully meeting discovery obligations in this case. *Id.* (noting GSA's June 22, 1994 Facsimile forwarding GSA's May 14, 1994 Policy to the Department of Justice on July 7, 2004).

For these reasons and because of the unique and *sui generis* circumstances of this case, the court has determined that the Government is not prejudiced by application of the doctrine of equitable tolling.

### 5. Under The Unique And *Sui Generis* Circumstances Of This Case, The Doctrine Of Laches Is Inapplicable.

The Government argues that "laches bars any equitable claim ... in this lawsuit." Gov't Post–Trial Memo at 119; *see also* Nov. 3, 1995 Answer to First Amended Complaint, Second Affirmative Defense at 43–44. Since the court has determined that Plaintiffs have a viable action in law, and are not dependent on pursuing an equitable action. As a matter of law, the doctrine of laches is not relevant.

The doctrine of laches is "an affirmative defense, equitable in nature, that denies relief to the plaintiff who has unreasonably or inexcusably delayed in asserting a claim." CORMAN ON LIMITATIONS at 183. The United

---

**55.** *See* March 18, 2005 Declaration of William J. Shapiro at Exhibit B (July 2, 2004 Certificate of Michael Dennis Daugherty, Attorney Advisor, Division of Mineral Resources, Office of the Solicitor, United States Department of the Interior) ("[W]e were not able to determine the location of any archived records concerning production for periods prior to the 1982 creation of Mineral Management Services."); Exhibit C (July 1, 2004 Certificate of Richard Bruce, Project Manager,

GSA, PBS, Property Disposal Division 4 PR) ("due to the age of certain reference materials, we can't be certain that we found every disposal file. In addition, many of the Chicago Records were transferred from GSA–Chicago to GSA–Atlanta in the early 1970's, but certain items were retained in the Chicago Archives. Therefore, to be as accurate as possible, someone would need to review every disposal file.").

States Court of Appeals for the Federal Circuit has held that "neglect or delay in bringing suit to remedy an alleged wrong, which together with the lapse of time and other considerations, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020, 1028–29 (Fed.Cir. 1992) (*en banc*). Although, considerable latitude is granted to the trial court in applying that doctrine, nevertheless, "it must be established that the delay is unreasonable and that it caused prejudice to the defendant." CORMAN ON LIMITATIONS § 3.3.2 at 183 (citing *Foster v. United States,* 733 F.2d 88 (Fed. Cir.1984)).

For the same reason, relevant to the court's determination regarding the application of the equitable doctrine of tolling in this case, in any event the Government cannot bear the burden to establish that delay in bringing a complaint in this court was unreasonable and caused the Government any prejudice. *See A.C. Aukerman,* 960 F.2d at 1028–29.

### 6. Counts III–IV Of The September 22, 1995 First Amended Complaint Are Not Ripe For Adjudication.

Plaintiffs have alleged claims based on the Just Compensation Clause and Due Process Clause of the United States Constitution. *See* Sept. 22, 1995 First Amended Complaint, Counts III–IV at 35–54. Since Plaintiffs did not pursue Count VI, Loss of Agricultural Products–Just Compensation Clause and Count VII, Loss of Agricultural Products–Due Process Clause, at trial the court has determined that these Counts should be dismissed for failure to prosecute. *See* RCFC 41(b).

As for Counts III–IV of the September 22, 1995 First Amended Complaint, the United States Supreme Court has advised where a plaintiff has alleged common law, statutory claims, and constitutional claims, the lower courts should avoid adjudicating constitutional questions. *See, e.g., Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 345, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998); *Tull v. United States,* 481 U.S. 412, 417 n. 3, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). Accord-

ingly, in this case, Plaintiffs' constitutional claims are not ripe for adjudication.

Therefore, the Government's November 12, 2004 Motion in Limine to Exclude and Strike Dr. Charles F. Haywood's Trial Testimony, the Government's December 10, 2004 Motion to Strike Dr. Charles F. Haywood's Rebuttal Testimony and Supplemental Exhibit List, and the Government's January 3, 2005 Renewed Motion to Strike the Rebuttal Testimony of Dr. Charles F. Haywood are denied as moot.

### 7. The Parties Are Ordered To Show Cause Why The Court Should Not Exercise Jurisdiction, Pursuant to 28 U.S.C. § 1491(a)(1), To Enter A Final Judgment And Stay Issuance Of A Report On S. 794, Pursuant to 28 U.S.C. § 2509.

Where a complaint seeks that the United States Court of Federal Claims exercise Congressional Reference jurisdiction, pursuant to 28 U.S.C. § 2509 and 28 U.S.C. § 1491(a)(1), and where the United States Court of Federal Claims has determined that the plaintiff has established a legal claim, *i.e.,* "one arising out of contract," a question of first impression is presented: Whether the United States Court of Federal Claims should exercise 28 U.S.C. § 1491(a)(1) jurisdiction, enter a final judgment, and stay the reference, instead of issuing a report that, if adopted or endorsed by the Review Panel, will be forwarded to Congress only to consider whether or not to seek appropriation of a specific sum in full satisfaction of all claims.

The court is aware of no legal precedent that impairs the exercise of 28 U.S.C. § 1491(a)(1) jurisdiction under such circumstances or any legal precedent requiring plaintiffs to exhaust a potential legislative remedy, when a legal claim has been established, for which the court may enter a final judgment and damages and the parties may seek appellate review. If the court exercises jurisdiction under 28 U.S.C. § 1491(a)(1), then the November 24, 1998 Order in this case should be vacated and all former landowners and heirs that complied with the court's deadline and were named as Plaintiffs in the September 22, 1995 First Amended

Complaint are entitled to receive their proportionate share of damages. In the event the court is reversed on appeal, the court would lift the stay, reinstate the November 24, 1998 Order, finalize this Interim Report, and forward it to the Review Panel. In the event the court is affirmed on appeal, Plaintiffs can proceed to enforce the judgment.

Therefore, prior to entry of a Report or Memorandum Opinion and Final Judgment, the parties are ordered to show cause why the court should not enter a final judgment, pursuant to 28 U.S.C. § 1491(a)(1), and stay issuance of a Final Report, pursuant to S. 794. Briefs should be submitted within 60 days and not exceed 20 pages. In addition, the court invites *amici* briefs from any interested entities, including the Senate Judiciary Committee, from which S. 794 originated, particularly in light of the fact that many of the Plaintiffs are constituents of Senator Mitch McConnell, who was active in supporting S. 794 as early as September 13, 1985, as expressed by his letter of that date to Mrs. Ruby Higginson Au stating:

> the circumstances that led to the creation of Camp Breckinridge led to some apparently tremendous injustices and it's unfortunate that the judicial system has not provided relief to the former landowners thus far. I believe ... efforts to obtain relief for the landowners are to be commended and if [a] bill ... is passed, the United States Claims Court will be in a position to look into the matter of determining a reasonable value for the land that was taken. I share your concerns for the proper treatment of the former landowners[.]

The United States Court of Federal Claims also shares that concern.

## IV. CONCLUSION

Therefore, for the aforegoing reasons, the Clerk of the Court will docket this Interim Report and Memorandum Opinion.

**IT IS SO ORDERED.**